[No. S158528. Jan. 25, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL EUGENE ROBINSON, Defendant and Appellant.

COUNSEL

Cara DeVito, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Gerald A. Engler and Michael P. Farrell, Assistant Attorneys General, Michael Chamberlain, Stephanie A. Mitchell, Doris A. Calandra and Enid A. Camps, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHIN, J.—A jury convicted defendant Paul Eugene Robinson of five felony sexual offenses, all perpetrated against Deborah L. on August 25, 1994. Each was punishable by imprisonment in state prison for a maximum of eight

years. Therefore, the prosecution had to commence "within six years after commission of the offense[s]" to satisfy the applicable statute of limitations. (Pen. Code, § 800.)[1]

Once the statute of limitations for an offense expires without the commencement of prosecution, prosecution for that offense is forever time-barred. (*Stogner v. California* (2003) 539 U.S. 607, 615–616 [156 L.Ed.2d 544, 123 S.Ct. 2446].)[2] As relevant here, a prosecution for an offense commences when an arrest warrant is issued and "names or describes the defendant with the same degree of *particularity* required for [a] complaint." (§ 804, subd. (d), italics added.)[3] The charging and arrest provisions permit the use of a fictitious name. (§§ 959, par. 4, 815.) However, "[i]f a fictitious name is used the warrant should also contain sufficient descriptive material to indicate with reasonable particularity the identification of the person whose arrest is ordered [citations]." (*People v. Montoya* (1967) 255 Cal.App.2d 137, 143 [63 Cal.Rptr. 73] (*Montoya*), relying on *West v. Cabell* (1894) 153 U.S. 78 [38 L.Ed. 643, 14 S.Ct. 752] (*Cabell*); see Cal. Const., art. I, § 13 [a warrant may issue only on probable cause "particularly describing" the persons or things to be seized].)

In this case, on August 21, 2000,[4] four days before the statute of limitations would have expired, the Sacramento County District Attorney

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] We note that, since February 28, 2005, section 803, subdivision (g)(1), has provided that, "[n]otwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date on which the identity of the suspect is conclusively established by DNA testing, if both of the following conditions are met: [¶] (A) The crime is one that is described in subdivision (c) of Section 290. [¶] (B) The offense was committed prior to January 1, 2001, and biological evidence collected in connection with the offense is analyzed for DNA type no later than January 1, 2004, or the offense was committed on or after January 1, 2001, and biological evidence collected in connection with the offense is analyzed for DNA type no later than two years from the date of the offense." Effective January 1, 2001, a prior version of section 803 was amended to extend the statute of limitations in unknown offender sex cases so that a complaint would be timely filed if filed "within one year of that date on which the identity of the suspect is conclusively established." (Former § 803, as amended by Stats. 2000, ch. 235, repealed as subsequently amended by Stats. 2005, ch. 2.) Neither the current nor the 2001 amendment applies to the present case because the statute of limitations had already run as to the crimes perpetrated against Deborah L. by January 1, 2001.

[3] We note that, while subdivision (g) of section 803 may now reduce the need to commence sex crime prosecutions within the applicable limitations periods by use of warrants, indictments, and complaints that identify yet-unknown suspects by their DNA profiles, nothing in that subdivision of section 803 limits subdivision (d) of section 804, which permits the commencement of prosecution in all cases by the issuance of sufficiently particularized fictitious name arrest warrants.

[4] All further date references are to the year 2000 unless otherwise specified.

filed a felony complaint against "John Doe, unknown male," describing him by his unique 13-loci deoxyribonucleic acid (DNA) profile. The next day, a John Doe arrest warrant issued, incorporating by reference the same DNA profile. On September 15, defendant was arrested based on an amended warrant that included his name. It was subsequently discovered that defendant's DNA profile in the state's DNA database, which linked defendant to the crimes committed against Deborah L., had been generated from blood mistakenly collected from defendant by local and state agencies in administering the DNA and Forensic Identification Database and Data Bank Act of 1998, as enacted (the Act). (§ 295 et seq.)

We granted review to decide (1) whether the issuance of a "John Doe" complaint or arrest warrant may timely commence a criminal action and thereby satisfy section 800's limitation period[5]; (2) whether an unknown suspect's DNA profile satisfies the "particularity" requirement for an arrest warrant; and (3) what remedy exists, if any, for the unlawful collection of genetic material under the 1998 version of the Act.[6]

■ For the reasons stated below, we conclude that, in cases in which the warrant identifies the perpetrator by his or her unique DNA profile only, the statute of limitations is satisfied if the prosecution is commenced by the filing of the "John Doe" arrest warrant within the limitations period.[7] In reaching this conclusion, we find that an unknown suspect's unique DNA profile satisfies the "particularity" requirement for an arrest warrant. (§ 804, subd. (d).) Although defendant's blood was mistakenly collected under the Act, we conclude that the law enforcement personnel errors in this case do not trigger the exclusionary rule. Accordingly, we affirm the Court of Appeal's judgment.

---

[5] To simplify our analysis, we discuss only the adequacy of a John Doe DNA *arrest warrant* to timely commence a criminal action. Because a prosecution commences either when a complaint is issued (§ 804, subd. (b)) or when an arrest warrant "is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint" (§ 804, subd. (d)), our analysis of the adequacy of a John Doe DNA arrest warrant to timely commence a criminal action applies with equal force to the adequacy of a John Doe DNA complaint.

[6] We also granted review on a fourth issue, but ordered briefing deferred, pending disposition of a related issue in another pending case. That case is now final and has resolved the fourth issue in the present case. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1260–1265 [78 Cal.Rptr.3d 69, 185 P.3d 49].)

[7] By using the descriptive term "unique," we refer to an individual DNA profile, such as the 13-loci DNA profile of defendant, that has essentially no chance of being duplicated in the human population except in the case of a genetically identical sibling.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 25, 1994, 24-year-old Deborah L. awoke to find a male adult stranger standing in her bedroom doorway wearing gloves and holding a knife. He told Deborah to be quiet and that he was there "to get some pussy." When she screamed, he called her a "white bitch" and threatened to kill her if she did not shut up. Based on his distinctive voice, his skin color, and his silhouette, Deborah thought the man was African-American.[8]

The man climbed on top of Deborah and held the knife to her chest; she cut her hand when she instinctively grabbed at the knife. The man directed Deborah to cover her face with a pillow. He then fondled her breasts, placed his mouth on her vagina, inserted his fingers in her vagina and rectum, and raped her. After losing and regaining an erection, he raped her a second time; this time he withdrew his penis, ejaculated on her legs, and rubbed his semen on her stomach. As the man dressed, he said he would kill Deborah if she looked at him. Once he was gone, she called 911.[9]

Police officers promptly took Deborah to a medical facility where a rape kit was prepared, vaginal swabs were collected, and her cut hand was stitched. The physician assistant who collected the vaginal swabs saw sperm on them. Jill Spriggs, an assistant criminal laboratory director for the California Department of Justice (Department), also found semen present on a swab collected from Deborah's vagina. In early August of 2000, Ms. Spriggs assayed that sperm to generate a genetic profile of the unknown male suspect as determined by the presence or absence of markers at 13 distinct DNA loci. Ms. Spriggs then used statistics to estimate, with respect to three racial groups, the probability that more than one person would harbor that same series of markers.

The parties stipulated that, prior to September 2000, defendant's blood had been collected, his DNA was profiled at 13 loci, and his profile had been entered into the Department's offender database. A Department criminalist testified the database is kept in the hope of matching DNA samples from

---

[8] During the attack, Deborah's assailant said he was "Mexican" or "Chicano." Deborah thought he was Black, but she said he could have been either a very dark-skinned Mexican or a light-skinned Black man.

[9] In the case before us, defendant was charged with additional counts involving another woman. The jury was unable to reach a verdict on those charges, a mistrial was declared, and the charges were dismissed. We limit our discussion to the facts and law pertaining to the offenses that resulted in convictions.

unsolved crimes with known profiles, and that such a match is called a "cold hit."

Four days before the six-year statute of limitations would have expired, a felony complaint was filed against "John Doe, unknown male," describing him by his 13-loci DNA profile. The next day, the trial court found probable cause in the complaint, and an arrest warrant issued for "John Doe," incorporating by reference that DNA profile. As relevant here, "John Doe" was identified as an "unknown male with Short Tandem Repeat (STR) Deoxyribonucleic Acid (DNA) Profile at the following Genetic Locations, using the COfiler and Profiler Plus Polymerase Chain Reaction (PCR) amplification kits: D3S1358 (15, 15), D16S539 (9, 10), THO1 (7, 7), TPOX (6, 9), CSF1PO (10, 11), D7S820 (8, 11), vWa (18, 19), FGA (22, 24), D8S1179 (12, 15), D21S11 (28, 28), D18S51 (20, 20), D5S818 (8, 13), D13S317 (10, 11), with said Genetic Profile being unique, occurring in approximately 1 in 21 sextillion of the Caucasian population, 1 in 650 quadrillion of the African American population, 1 in 420 sextillion of the Hispanic population."

In September, a criminalist who searched the Department's offender database using the DNA profile Ms. Spriggs had developed in the Deborah L. case generated a "cold hit" match between the 13-loci DNA profile in the John Doe arrest warrant and defendant Robinson's profile in the state's DNA database. Based on the match, an amended arrest warrant with Robinson's name issued; it was executed on September 15.

After defendant's arrest on September 15, his blood was collected, and Ms. Spriggs conducted an independent DNA analysis using that new blood sample. Comparing defendant's DNA profile from that blood with the DNA profile obtained earlier from the evidentiary semen from the vaginal swab, Ms. Spriggs found the two profiles matched "at all 13 loci." Based on her statistical calculations made to determine the frequency of a genetic profile in a random unrelated population, Ms. Spriggs testified that she estimated that the probability that two people would share identical DNA patterns at each of the 13 loci tested is one in 650 quadrillion (650 followed by 15 zeros) in the African-American population, one in six sextillion (6 followed by 21 zeros) in the Caucasian population, and one in 33 sextillion (33 followed by 21 zeros) in the Hispanic population.[10] Ms. Spriggs testified that there had been no reported cases of two people who are not identical twins matching at all 13 loci.

---

[10] The discrepancy in the random match probability statistics in Ms. Spriggs's testimony and those set forth in the arrest warrant does not affect our analysis of the issues presented in this case.

Defendant was found guilty of one count of forcible oral copulation (§ 288a, subd. (c)(2)),[11] two counts of forcible sexual penetration by a foreign object (§ 289, subd. (a)(1)), and two counts of forcible rape (§ 261, subd. (a)(2)). The jury also found true allegations that defendant used and was armed with a deadly and dangerous weapon during all five counts. (Former § 12022, subd. (b)(1), as amended by Stats. 1999, ch. 129, § 4; former § 12022.3, subds. (a), (b), as amended by Stats. 1997, ch. 109, § 1.)[12] The trial court sentenced defendant to 65 years in state prison. The Court of Appeal affirmed the judgment. We granted review limited to the issues set forth above.

## II. DISCUSSION

### A. Applicability of the Federal Exclusionary Rule to Unlawful Collection of Defendant's Genetic Material Under the Act

#### 1. Introduction

The parties agree defendant's March 2, 1999 blood sample was collected in violation of the Act as it was originally enacted. Defendant contends the federal exclusionary rule is the appropriate "remedy to apply to the police personnel errors that occurred in this case." We disagree.

#### 2. Background of the Act

The Act became effective January 1, 1999. (Stats. 1998, ch. 696, § 4.)[13] It created a databank to assist "criminal justice and law enforcement agencies

---

[11] The abstract of judgment erroneously designates this offense as a violation of section 288, subdivision (a)(2). We shall order that the abstract of judgment be amended to correct this error.

[12] Like the Court of Appeal, we assume the trial court intended to strike the alleged prior conviction enhancements (§§ 667, 667.5, subd. (b), 1170.12) because the underlying convictions were entered after defendant committed the crimes against Deborah L. (See *People v. Rojas* (1988) 206 Cal.App.3d 795, 802 [253 Cal.Rptr. 786].)

[13] The Act has been amended several times since its enactment. (E.g., Stats. 2002, ch. 916; Prop. 69, as approved by voters, Gen. Elec. (Nov. 2, 2004); Stats. 2006, ch. 69, § 28.) Unless otherwise pertinent, we discuss and apply the law as originally enacted (Stats. 1998, ch. 696, § 2), which was the law in effect when defendant's blood was drawn and analyzed in 1999. We simply note that the present version of section 296 was enacted on November 2, 2004, with the voters' passage of Proposition 69. Currently, it provides that anyone convicted of a felony, "regardless of [the] sentence imposed . . . or any other disposition rendered in the case . . . or whether the person is diverted, fined, or referred for evaluation," must provide samples for DNA analysis and identification. (Current § 296, subd. (b).)

within and outside California in the expeditious detection and prosecution of individuals responsible for sex offenses and other violent crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children."

In 1999, the Act required, in relevant part, that any person convicted of a specified crime, referred to as a "qualifying offense" (former § 295, subd. (e)), had to provide, among other samples and impressions, "two specimens of blood" for "law enforcement identification analysis." (Former § 296, subd. (a)(1).) The Department's DNA laboratory was given responsibility for implementing the Act and managing and administering the state's DNA database and databank identification program. (Former § 295, subds. (d), (e).) In part, the Act required the Department to "perform DNA analysis" of the collected specimens, to save the biological samples, and "store, compile, correlate, compare, maintain, and use DNA and forensic identification profiles and records." (Former § 295.1, subds. (a), (c).)

The Act gave state and local law enforcement and correctional officials responsibility for collecting the biological samples and impressions from qualified offenders. (Former §§ 295, subd. (f)(1), 295.1, subds. (a), (d), 296.1, subd. (a).) As enacted, it required that collection of those specimens be done "as soon as administratively practicable," regardless of the place of confinement. (Former § 296, subd. (b).)

Subdivision (a)(1) of former section 296 listed as offenders subject to collection of specimens, samples, and print impressions "[a]ny person who is convicted of, or pleads guilty or no contest to, any of the following crimes, . . . regardless of sentence imposed or disposition rendered . . . ." Among the listed offenses was felony spousal abuse (§ 273.5) and felony assault or battery (§ 245). (Former § 296, subd. (a)(1)(D), (F).) Others subject to the collection requirements included "[a]ny person . . . who is convicted of a felony offense of assault or battery in violation of Section . . . 245 . . . , and who is committed to . . . any institution under the jurisdiction of the Department of the Youth Authority where he or she was confined . . . ." (Former § 296, subd. (a)(2).)[14] The Act provided that "[a] person whose DNA profile has been included in the databank pursuant to this chapter shall have his or her information and materials expunged from the data bank when . . .

---

[14] A juvenile adjudication is not a conviction. (Welf. & Inst. Code, § 203; *In re Bernardino S.* (1992) 4 Cal.App.4th 613, 618 [5 Cal.Rptr.2d 746].)

the defendant has been found not guilty . . . of the underlying offense." (Former § 299, subd. (a).)

### 3. *Relevant Factual Background*

At the time the March 2, 1999 blood sample was collected and when that sample was entered into the state databank, law enforcement personnel mistakenly believed defendant had been convicted of a "qualifying" offense under the Act.

The Act was enacted while defendant was in custody at Rio Cosumnes Correctional Center (the Center) serving his sentence for two misdemeanor convictions and awaiting transfer to state prison based on a parole revocation with regard to a prior conviction for felony first degree burglary for which defendant had served a term of imprisonment.[15] Soon after the Act went into effect, an unknown person in the Center's records department completed a DNA testing requirement form in which defendant was mistakenly identified as a prisoner with a qualifying offense based on his 1994 conviction for spousal abuse.[16] As a result of that mistake, a sample of defendant's blood was drawn on March 2, 1999.

The March 2, 1999 blood sample was submitted to the Department's laboratory database section where it underwent a Department-initiated, non-statutory verification process to confirm a prisoner's qualified offender status. In July 1999, during that verification process, a Department employee noticed

---

[15] At the time officers collected defendant's blood samples in 1999, felony burglary was not yet listed as a qualifying offense requiring collection of blood and saliva for DNA analysis. (See former § 296, subd. (a)(1).) We do not address the People's contention that defendant's March 2, 1999 sample was properly collected because "he was in custody on a parole hold arising from a prior felony first-degree burglary conviction, following his December 1998 misdemeanor conviction." Having limited the issues for review to address the appropriate remedy for the *unlawful* collection of genetic material under the Act, we impliedly accepted the Court of Appeal's conclusion that there was, at a minimum, a statutory violation of the Act in this case. (See Cal. Rules of Court, rule 8.516.) Similarly, we note that a second blood sample was collected from defendant on September 2, 2002, after the Act was expanded to include first degree burglaries. (Stats. 2001, ch. 906.) That sample, received by the Department's laboratory on September 9, 2002, was entered into the Department's DNA database on November 22, 2002. The issue of inevitable discovery, litigated before the Court of Appeal, is not before us.

[16] Spousal battery is punishable either as a misdemeanor or a felony. (§§ 17, 273.5, subd. (a).) Only a felony conviction of spousal abuse was a qualifying offense under former section 296, subdivision (a)(1)(D), and defendant had been convicted of misdemeanor, rather than felony, spousal abuse.

that defendant's conviction for spousal abuse was a nonqualifying misdemeanor. That employee then mistakenly determined that defendant had a qualifying prior juvenile adjudication for assault with a deadly weapon (§ 245).[17] As a result of that mistake, the March 2, 1999 blood sample was deemed to be qualified for inclusion in the state database.

Defendant filed a section 1538.5 motion to suppress the March 2, 1999 blood sample and the resulting DNA test evidence. The motion was denied. We include a summary of testimony presented at the suppression hearing in our discussion regarding whether the federal exclusionary rule applies to the law enforcement conduct that led to the mistaken collection of the March 2, 1999 blood sample and its inclusion in the database.

### 4. *Remedy for Unlawful Collection of Genetic Material Under the Act*

■ Defendant contends the DNA test evidence admitted at trial should have been excluded because its collection was not authorized in 1999. "Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal Code section 1538.5 only if exclusion is mandated by the federal Constitution." (*People v. Banks* (1993) 6 Cal.4th 926, 934 [25 Cal.Rptr.2d 524, 863 P.2d 769].) Our Constitution thus prohibits employing an exclusionary rule that is more expansive than that articulated by the United States Supreme Court. (*People v. Crittenden* (1994) 9 Cal.4th 83, 129 [36 Cal.Rptr.2d 474, 885 P.2d 887].) For the reasons stated below, we conclude the nonconsensual extraction of defendant's blood for the March 2, 1999 sample, although a state statutory violation under the 1999 version of the Act, did not violate the Fourth Amendment. However, even assuming that the nonconsensual extraction of defendant's blood on March 2, 1999, did violate the Fourth Amendment, the law enforcement personnel errors that led to the mistaken collection of that March 2, 1999 blood sample would not have triggered the federal exclusionary rule. Accordingly, exclusion of the evidence obtained from that sample is not an available remedy for defendant.

■ Invasions of the body, including nonconsensual extractions of an incarcerated felon's blood for DNA profiling, are searches entitled to the protections of the Fourth Amendment. (*Skinner v. Railway Labor Executives'*

---

[17] Although the rap sheet indicated "211 and 245 to Juvenile Hall," sealed records of the 1985 juvenile adjudication later revealed that defendant had suffered a felony grand theft (§ 487) adjudication only. The employee mistakenly concluded the juvenile adjudication, for which defendant had been ordered to participate in a juvenile work project, constituted a qualifying offense under the Act as it read in 1999; she also mistakenly concluded the adjudication was for felony assault, rather than for felony grand theft, a nonqualifying felony. (See former §§ 296, subd. (a)(1)(F), 296.1, subd. (c).)

*Assn.* (1989) 489 U.S. 602, 616–617 [103 L.Ed.2d 639, 109 S.Ct. 1402].) "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.' " (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652 [132 L.Ed.2d 564, 115 S.Ct. 2386].)

"Reasonableness . . . is measured in objective terms by examining the totality of the circumstances" (*Ohio v. Robinette* (1996) 519 U.S. 33, 39 [136 L.Ed.2d 347, 117 S.Ct. 417]), and "whether a particular search meets the reasonableness standard ' "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." ' " (*Vernonia School Dist. 47J v. Acton, supra,* 515 U.S. at pp. 652–653; see also *Samson v. California* (2006) 547 U.S. 843, 848 [165 L.Ed.2d 250, 126 S.Ct. 2193] (*Samson*).)

The United States Supreme Court has explained that an intrusion caused by a blood test is not significant because such tests are " 'commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.' " (*Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. at p. 625.) Moreover, "convicted criminals do not enjoy the same expectation of privacy that nonconvicts" have (*People v. Adams* (2004) 115 Cal.App.4th 243, 258 [9 Cal.Rptr.3d 170]) with respect to their identities and their bodies. (*Hudson v. Palmer* (1984) 468 U.S. 517, 530 [82 L.Ed.2d 393, 104 S.Ct. 3194]; *Bell v. Wolfish* (1979) 441 U.S. 520, 558 [60 L.Ed.2d 447, 99 S.Ct. 1861]; *People v. King* (2000) 82 Cal.App.4th 1363, 1374–1375 [99 Cal.Rptr.2d 220] (*King*).) "That the gathering of DNA information requires the drawing of blood rather than inking and rolling a person's fingerprints does not elevate the intrusion upon the [defendant's] Fourth Amendment interests to a level beyond minimal." (*Rise v. Oregon* (9th Cir. 1995) 59 F.3d 1556, 1560, fn. omitted; see also *Nicholas v. Goord* (2d Cir. 2005) 430 F.3d 652, 669 ["In the prison context, where inmates are routinely subject to medical procedures, including blood draws, and where their expectation of bodily privacy, while intact, is diminished [citation], the intrusiveness of a blood draw is even further minimized." (fn. omitted)]; *U.S. v. Kincade* (9th Cir. 2004) 379 F.3d 813, 837 (*Kincade*).) Accordingly, courts repeatedly have upheld our state Act and the similar federal act, the DNA Analysis Backlog Elimination Act of 2000 (Pub.L. No. 106-546 (Dec. 19, 2000) 114 Stat. 2726) for qualified offenders as a reasonable law enforcement tool for solving crimes. (*Kincade, supra,* 379 F.3d at p. 836; see also *People v. Adams, supra,* 115 Cal.App.4th at pp. 255–259; *Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 505 [120 Cal.Rptr.2d 197] (*Alfaro*).)

■ With regard to any privacy interest in identifying information, it is established that individuals in lawful custody cannot claim privacy in their identification. "Though, like fingerprinting, collection of a DNA sample for purposes of identification implicates the Fourth Amendment, persons incarcerated after conviction retain no constitutional privacy interest against their correct identification." (*Groceman v. U.S. Dept. of Justice* (5th Cir. 2004) 354 F.3d 411, 413–414.) In *Kincade*, the court explained that "the DNA profile derived from the defendant's blood sample establishes only a record of the defendant's identity—otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense (indeed, once lawfully arrested and booked into state custody). For, as we recognized in *Rise*, '[o]nce a person is convicted of one of the felonies included as predicate offenses under [the Act], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from blood sampling.' 59 F.3d at 1560; see also *Groceman*[, *supra*,] 354 F.3d at 413–[4]14; *Jones*[ *v. Murray* (4th Cir. 1992)] 962 F.2d [302,] 306–[3]07." (*Kincade, supra*, 379 F.3d at p. 837, italics omitted.)

■ In response to challenges to the amendment that authorized collection in California from *all* adult felons, several state appellate courts have concluded that "the extraction of biological samples from an adult felon is not an unreasonable search and seizure within the meaning of the Fourth Amendment." (*In re Calvin S.* (2007) 150 Cal.App.4th 443, 447 [58 Cal.Rptr.3d 559]; see also *People v. Travis* (2006) 139 Cal.App.4th 1271, 1281–1290 [44 Cal.Rptr.3d 177]; *People v. Johnson* (2006) 139 Cal.App.4th 1135, 1168 [43 Cal.Rptr.3d 587]; *Alfaro, supra*, 98 Cal.App.4th at pp. 505–506; *King, supra*, 82 Cal.App.4th at pp. 1371–1378.) We agree with our state appellate courts that the "nonconsensual extraction of biological samples for identification purposes does implicate [federal] constitutional interests" (*Alfaro, supra*, 98 Cal.App.4th at p. 505), but that such nonconsensual extraction of biological samples from adult felons is reasonable because "those convicted of serious crimes have a diminished expectation of privacy and the intrusions authorized by the Act are minimal" while "the Act serves compelling governmental interests," including " 'the overwhelming public interest in prosecuting crimes *accurately*.' [Citation.] A minimally intrusive methodology that can serve to avoid erroneous convictions and to bring to light and rectify erroneous convictions that have occurred manifestly serves a compelling public interest." (*Id.* at pp. 505–506; see also *In re Calvin S., supra*, 150 Cal.App.4th at p. 449 [nonconsensual extraction of biological

samples from juveniles conducted pursuant to § 296 is not unreasonable within the meaning of the 4th Amend.].)[18]

■ The fact that defendant Robinson's blood was collected in violation of our state law at the time does not alter our Fourth Amendment analysis. That law was more restrictive than the Fourth Amendment and, for Fourth Amendment purposes, it is not dispositive that a search and seizure was not permissible under state law. The United States Supreme Court has held that, as far as the federal Constitution is concerned, "whether state law authorized the search [is] irrelevant." (*Virginia v. Moore* (2008) 553 U.S. 164, 171 [170 L.Ed.2d 559, 128 S.Ct. 1598] (*Moore*); accord, *Whren v. United States* (1996) 517 U.S. 806 [135 L.Ed.2d 89, 116 S.Ct. 1769]; *California v. Greenwood* (1988) 486 U.S. 35, 43–44 [100 L.Ed.2d 30, 108 S.Ct. 1625]; *Cooper v. California* (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788].) The Supreme Court explained that the Fourth Amendment is not historically understood "as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted" (*Moore, supra*, 553 U.S. at p. 168 [128 S.Ct. at p. 1602]), and that its meaning does not change "with local law enforcement practices," which " 'vary from place to place and from time to time.' " (*Id.* at p. 172 [128 S.Ct. at p. 1605].) While states remain "free 'to impose higher standards on searches and seizures than required by the federal Constitution' " (*id.* at p. 171 [128 S.Ct. at p. 1604]), a state's "choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional" (*id.* at p. 174 [128 S.Ct. at p. 1606]). With regard to the issue presented in *Moore*, the court held that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." (*Id.* at p. 176 [128 S.Ct. at p. 1607]; see also *Samson, supra*, 547 U.S. at p. 855 [holding the 4th Amend. does not prohibit a police officer from conducting a search of a parolee without any suspicion of that parolee while finding "of little relevance" the fact that some states and the federal government require a level of individualized suspicion before searching a parolee].)

■ The reasoning in *Moore* and *Samson* applies here, where virtually every court to consider the constitutionality of a DNA statute has upheld it against a Fourth Amendment challenge, but the list of qualifying or predicate offenses has varied from state to state over time. (*Moore, supra*, 553 U.S. at

---

[18] We note that a California federal district court recently held that "after a judicial or grand jury determination of probable cause has been made for felony criminal charges against a defendant, no Fourth Amendment or other Constitutional violation is caused by a universal requirement that a charged defendant . . . undergo a 'swab test,' or a blood test when necessary, for the purposes of DNA analysis to be used solely for criminal law enforcement, identification purposes." (*U.S. v. Pool* (E.D.Cal. 2009) 645 F.Supp.2d 903, 917.)

p. 172 [128 S.Ct. at p. 1605].) For example, Virginia collected DNA under its statute from all felons as early as 1990. (*Jones v. Murray* (4th Cir. 1992) 962 F.2d 302, 304.) Wisconsin allowed collection for a limited number of offenses in 1993, but amended its statute in 1999 to require collection from all felons. (*Green v. Berge* (7th Cir. 2004) 354 F.3d 675, 676.) Significantly, our state statute's initially restricted list of qualifying offenses was regularly expanded and now authorizes the nonconsensual extraction of biological samples from all adult felons. (Current § 296, subd. (a)(1).) These interstate statutory differences do not control the meaning of the Fourth Amendment, which does not depend on the differing and evolving DNA collection laws of particular states at particular times. Instead, the question remains the same, namely, whether, under all the circumstances, the nonconsensual collection of DNA from a convicted felon is reasonable as " ' "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." ' " (*Vernonia School Dist. 47J v. Acton, supra,* 515 U.S. at pp. 652–653.) We agree with those courts that have answered that question in the affirmative.[19]

Having decided that a lawfully convicted and incarcerated felon, such as defendant, does not have a Fourth Amendment right to prevent state authorities from collecting a blood sample for DNA profiling, we conclude that the March 2, 1999 blood sample and the DNA test evidence obtained as a result of that sample were properly admitted into evidence at defendant's trial.

---

[19] We note that, by restricting the offenses that would permit the collection of DNA samples in the original version of the Act, our Legislature did not concede it lacked an interest in collecting DNA identification information from convicted criminals who had not committed one of the qualifying offenses. The Legislature explained in former section 297, subdivision (e), that "[t]he limitation on the types of offenses set forth in subdivision (a) of Section 296 as subject to the collection and testing procedures of this chapter is for the purpose of facilitating the administration of this chapter. The . . . conviction of a person based upon a data bank match or data base information is not invalidated if it is later determined that the . . . samples . . . were obtained or placed in the data bank or data base by mistake." A finding that our Legislature saw no compelling interest in the identity of defendant merely because the offense he committed was not listed would be an error that would "frustrate rather than further state policy." (*Moore, supra,* 553 U.S. at p. 174 [128 S.Ct. at p. 1606].) In *Moore,* the high court rejected the defendant's argument that the state "has no interest in arrest when it has a policy against arresting for certain crimes." (*Id.* at p. 173 [128 S.Ct. at p. 1605].) Instead, it found that the state policy demonstrated "that the State values its interests in forgoing arrests more highly than its interests in making them, [citation]; or as showing that the State places a higher premium on privacy than the Fourth Amendment requires" (*id.* at p. 174 [128 S.Ct. at p. 1606]), rather than demonstrating that the state lacks any interest in the arrest. The court observed that the arrest still serves the interests underlying the Fourth Amendment rule allowing such an arrest, including ensuring the suspect will appear at trial, preventing him from committing further offenses, and allowing officers to investigate more fully. (553 U.S. at p. 173 [128 S.Ct. at p. 1605].)

However, even assuming, without deciding, that the state statutory violation that led to the nonconsensual extraction of defendant's blood for the March 2, 1999 blood sample constituted a Fourth Amendment violation, application of the federal exclusionary rule would not be appropriate for such a violation. (See *Hudson v. Michigan* (2006) 547 U.S. 586, 590, 602 [165 L.Ed.2d 56, 126 S.Ct. 2159] (*Hudson*) [statutory knock-and-announce violation does not necessarily trigger the exclusionary rule].)[20]

■ The exclusionary rule applies only "where its deterrence benefits outweigh its 'substantial social costs.'" (*Pennsylvania Bd. of Probation and Parole v. Scott* (1998) 524 U.S. 357, 363 [141 L.Ed.2d 344, 118 S.Ct. 2014], quoting *United States v. Leon* (1984) 468 U.S. 897, 907 [82 L.Ed.2d 677, 104 S.Ct. 3405]; accord, *Arizona v. Evans* (1995) 514 U.S. 1, 13 [131 L.Ed.2d 34, 115 S.Ct. 1185]; see also *People v. Reyes* (1998) 19 Cal.4th 743, 755–756 [80 Cal.Rptr.2d 734, 968 P.2d 445].) The United States Supreme Court has cautioned that "[s]uppression of evidence . . . has always been our last resort." (*Hudson, supra,* 547 U.S. at p. 591.) In *Hudson,* the court emphasized that the exclusionary rule's " 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." (*Ibid.*)

In *Herring v. United States* (2009) 555 U.S. ___ [172 L.Ed.2d 496, 129 S.Ct. 695] (*Herring*), the United State Supreme Court explained that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." (*Id.* at p. ___ [129 S.Ct. at p. 702].)

The facts in *Herring* involved an officer who reasonably, but mistakenly, believed there was an outstanding warrant for Herring. When Herring appeared at the sheriff's department to get something from his impounded truck, investigator Anderson recognized him and asked a county clerk to check for

---

[20] We reject the People's argument that expungement is the sole potential remedy available for the unlawful collection of genetic material under the Act. Section 299 does not presently expressly provide a remedy for the unlawful collection of a blood sample where an individual was not convicted of a qualifying offense at the time the sample was taken. (Current § 299, subd. (a).) We note, however, that former section 297, subdivision (e), stated that "[t]he detention, arrest, wardship, or conviction of a person based upon a data bank match or data base information is not invalidated if it is later determined that the specimens, samples, or print impressions were obtained or placed in a data bank or data base by mistake." We also note that former section 299, subdivision (c), similarly provided that "[a]ny identification, warrant, probable cause to arrest, or arrest based upon a data bank match is not invalidated due to a failure to expunge or a delay in expunging records."

outstanding warrants for Herring's arrest. When none were found, Anderson asked the clerk to check with her counterpart in a neighboring county. That clerk replied that there was an active arrest warrant for Herring's failure to appear on a felony charge. Because of a negligent bookkeeping error by another law enforcement employee, the fact that the warrant had been recalled had not been entered in the database. The incorrect information was relayed to Anderson, who, along with a sheriff's deputy, followed Herring from the impound lot and arrested him. During a search incident to the arrest, methamphetamine was found in Herring's pocket, and a pistol was found in his vehicle. (*Herring, supra*, 555 U.S. at p. ___ [129 S.Ct. at p. 699].)

In agreeing with the Eleventh Circuit Court of Appeals that the challenged evidence was admissible, the Supreme Court stated, "In light of our repeated holdings that the deterrent effect of suppression must be substantial and outweigh any harm to the justice system, *e.g.*, [*United States v.* ]*Leon*, [*supra*, ]468 U. S., at 909–910, we conclude that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.' *Id.*, at 907–908, n. 6 (internal quotations marks omitted). In such a case, the criminal should not 'go free because the constable has blundered.' *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926) (opinion of the Court by Cardozo, J.)." (*Herring, supra*, 555 U.S. at p. ___ [129 S.Ct. at p. 704].)

The parties before us agree the violations of the Act in defendant's case were unintentional mistakes made during the early implementation of the Act. The People characterize those mistakes as "non-deliberate, non-flagrant, and non-systemic"; in other words, as " 'non-culpable negligence, at most.' " On the other hand, defendant contends the mistaken collection of the March 2, 1999 blood sample was the result of a "cascading series of errors" that were "indicative of a systemic breakdown," the order to draw blood was not attenuated from its seizure from defendant, and "the search in *Herring* was limited to the suspect's clothes and vehicle, whereas the seizure here occurred from [defendant's] very body."

We first note that nothing in *Herring* supports defendant's suggestion that whether or not the exclusionary rule is triggered in a particular case should depend upon whether "an error results in a seizure of evidence from a suspect's body rather than from the suspect's 'person.' " We reject defendant's claim that "the seizure of biological material from [his] very body affects the determination of whether the police conduct here was more culpable or reckless than mere negligence."

We next note that the Supreme Court's general holding regarding what conduct triggers the exclusionary rule does not focus on the issue of

attenuation, and we find that issue has no relevance to our analysis in this particular case. (*Herring, supra*, 555 U.S. at p. ___ [129 S.Ct. at p. 702].) Instead, the high court requires us to focus on whether the facts presented warrant application of the exclusionary rule "to deter deliberate, reckless, or grossly negligent conduct, or . . . recurring or systemic negligence." (*Id.* at p. ___ [129 S.Ct. at p. 702].) As in *Herring*, we find that "[t]he error in this case does not rise to that level." (*Id.* at p. ___ [129 S.Ct. at p. 702].)

On appeal, we uphold any express or implied factual findings of the trial court that are supported by substantial evidence. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].) Here, in ruling the March 2, 1999 blood sample and DNA test evidence were admissible, the trial court found that the mistakes that led to the unlawful collection of defendant's blood were made because correctional staff was under pressure to immediately implement a newly enacted law that was complex and confusing, that the motivation for the collection of the March 2, 1999 blood sample "was a good faith belief, possibly based on a negligent analysis by someone, that the defendant was a qualified offender and that the law directed his sample to be obtained." The trial court also found that, while the Department did not act in a "perfect manner," it acted in a "responsible" and "conscientious" manner in "trying to keep [its] errors to a very low level." The following evidence presented at the motion to suppress supports the trial court's findings that the errors in this case were negligent rather than deliberate, reckless, or systemic.

The director of the Department's Bureau of Forensic Services Toxicology Laboratory (the Director) testified that he worked "full time" on implementation of the Act as of December 1998. In the early months of that assignment, he reviewed the legislation, consulted the Attorney General, and developed materials that he delivered to various locations. He later created a specific information bulletin that was distributed to approximately 600 law enforcement agencies throughout the state. The Director quickly worked to disseminate information about the Act because the Department had to inform law enforcement agencies "what they needed to do to be able to provide us with the new samples." His typical presentations included information regarding "what were qualifying offenses. He also discussed how they would decide what the process was to be able to find out whether they were qualifying offenses." In that regard, the Director advised law enforcement personnel to use the Department's "automated criminal history system" to "pull up the rap sheet" in order to determine whether an individual in custody had a qualifying felony offense and how to distinguish whether "wobblers" were misdemeanor or felony offenses.

The Director gave at least 36 presentations throughout California during 1999; during those training sessions, law enforcement personnel occasionally

expressed "confusion in terms of how to implement" the Act because "[]it was a very difficult law to understand." The first training session in the Sacramento area was in April 1999. The first information bulletin, including an attachment that delineated qualifying offenses and detailed that individuals "needed to be convicted rather than adjudicated to qualify," was sent out in July 1999. In his testimony, the Director explained that the Act expanded the number of offenses that qualified for DNA analysis,[21] that, upon implementation of the Act, the Department "was serious" about only allowing qualifying offenses or qualifying offenders into the databank, and that law enforcement was advised to request a record of disposition from the courts whenever an ambiguity arose as to whether the prisoner had a qualifying offense. The Director further testified that he did not personally train DNA databank employees on qualifying samples for inclusion in the databank, but that he was aware the databank provided in-house training under the direction of Kenneth Konzak, the criminalist manager of California's DNA databank laboratory.

At the hearing on the motion to suppress, Konzak testified that he helped establish the FBI's Combined DNA Index System (CODIS), which is software that compares qualifying offender samples to profiles collected at a crime scene. Testifying as an expert, Konzak noted that, as to all state and federal government databanks, "for offenders there's a qualifying requirement . . . for a conviction or adjudication of some kind." Konzak explained that California's DNA databank employees were trained regarding "who are qualifying offenders" by "on-the-job" training and in training sessions. He admitted the Act initially was "administratively very complicated"; because it greatly expanded the number of qualifying offenders, it required the rapid hiring of many new analysts, and the implementation process required the DNA databank laboratory to "call in to our legal unit almost every day about some issue or another." He refuted any suggestion that the Department had a systemic or deliberate policy of entering nonqualifying profiles into its database by noting that the draconian sanction for such a policy could be expulsion from the national crime-solving index and removal of the CODIS software from a noncompliant laboratory. Konzak noted that, although in 1999 and 2000 there was no statutory requirement for the DNA laboratory to confirm that an individual had been appropriately identified as a qualifying offender,[22] the laboratory did so in an "attempt to do the best we could to

---

[21] Compare former section 290.2 (Stats. 1994, 1st Ex. Sess. 1993–1994, ch. 42, § 1, p. 8735) with former section 296.

[22] Effective January 1, 2001, the Act was amended to provide that "[t]he DNA laboratory procedures shall confirm that the offender qualifies for entry into the DNA data bank prior to actual entry of the information into the DNA data bank." (Former § 298, subd. (b)(4), as amended by Stats. 2000, ch. 823, § 4.) In 2004, that language was deleted. (Prop. 69, § 3, as approved by voters, Gen. Elec. (Nov. 2, 2004).)

follow the statute." To confirm the presence of a qualifying offense, laboratory employees used an automated criminal history system, the California Law Enforcement Telecommunications System (CLETS), to track the criminal history (rap sheet) associated with an offender's fingerprints and his or her CII (criminal identification index) number. Finally, Konzak testified that in June 1999, the lab manager stopped all searches of the database to verify "tens of thousands" of offender profiles after discovering, in an unrelated case similar to the one before us now, that a profiled offender who had been thought to have a qualifying offense actually had been convicted only of misdemeanor spousal abuse (§ 273.5).

Deputy Sheriff Lawrence Ortiz testified that in February 1999 he was trained regarding how to identify and collect DNA samples pursuant to the recently passed Act from individuals at the Center who had been convicted of sex and violent offenses. He then began training the Center's civilian records officers on how to identify qualified offenders. Ortiz testified that the staff was alerted about the system's "capabilities to look for qualifying" offenses, that only certain felony offenses constituted qualifying offenses, and that the system and CLETS "read[] out felony or misdemeanor depending on the severity of the conviction." He said staff "early on" exhibited "confusion" about what constituted a qualifying offense, and that even in 2003, the year he testified, "there's an occasional question as to [the] qualifications." Ortiz said he and the staff would "err on the side of caution" and treat juvenile adjudications as nonqualifying offenses if they resulted in a juvenile hall disposition only. He noted that early implementation of the Act at the Center resulted in "[b]orderline chaos" because he and his large staff were under pressure to quickly identify offenders and complete the collection kits provided by the Department. At the time defendant's blood was collected, approximately 16 records officers were working in four shifts day and night to determine whether inmates at the Center had qualifying offenses. Ortiz relied on his staff's indication that there was a qualifying offense without verifying that assessment because he lacked the time to "personally validate" each determination. However, whenever an inmate indicated he did not believe he was a qualified offender, Ortiz would research the issue himself. Ortiz conceded that, in March of 1999, if a rap sheet indicated that a person "had a [section] 245 as a juvenile, sent to juvenile hall," he "might possibly" have mistakenly collected a DNA blood sample from that individual. At the time defendant's March 2, 1999 blood sample was collected, Ortiz believed defendant "did in fact have a qualifying offense." He believed everybody on his staff "knew the difference between a misdemeanor and a felony [section] 273.5" and that the employee who qualified defendant's section 273.5 offense therefore must have believed it was a felony conviction.

We agree with the trial court that, although errors were made during the early implementation of the Act, law enforcement employees conscientiously

tried to follow its requirements for collection of biological samples and inclusion of those samples in the state databank, including conscientiously trying to make accurate determinations regarding whether an individual had a qualifying offense under former section 296. The trial court's finding that law enforcement tried to keep errors at a low level is supported by the training implemented in response to the Act and the fact that the Department's laboratory initiated its own nonstatutory verification process to confirm a prisoner's qualified offender status after the qualification determination that resulted in collection of a biological sample.

Here, as in *Herring*, we hold that the challenged errors do not, by themselves, "require the 'extreme sanction of exclusion.' " (*Herring*, *supra*, 555 U.S. at p. ___ [129 S.Ct. at p. 700].) We agree with the trial court that the law enforcement personnel errors in this case were the result of negligence, "rather than systemic error or reckless disregard of constitutional requirements," that the unlawful collection of genetic material under the Act was not "sufficiently deliberate that exclusion can meaningfully deter it," and that the law enforcement personnel were not sufficiently culpable that such deterrence is worth the price paid by the justice system. (*Herring*, *supra*, 555 U.S. at pp. ___, ___ [129 S.Ct. at pp. 704, 702].)[23]

We have analyzed the nonconsensual extraction of defendant's blood for the March 2, 1999 blood sample as a state statutory violation that did not violate the Fourth Amendment, and, alternatively, as an assumed federal constitutional violation. In either case, we agree with the Court of Appeal that "the exclusionary rule is inapplicable to suppress the [blood and DNA test] evidence in this case."

**B.** *Satisfaction of Constitutional and Statutory Particularity Requirements with a Warrant Identifying a Person to be Arrested by a Description of His Unique DNA Profile*

On August 21, 2000, a complaint was filed, and one day later, a corresponding arrest warrant issued against "John Doe, unknown male" for charges based on the sexual assault against Deborah L. on August 25, 1994.

---

[23] In this regard, we agree with the Court of Appeal that "the definition of a qualifying offense has been expanded and simplified, thereby reducing the possibility of similar mistakes in the future. At the November 2, 2004 General Election, the voters adopted Proposition 69, which expanded the definition of a qualifying offense to include *any felony*, whether committed by a juvenile or an adult and whether suffered by conviction or juvenile adjudication. (§ 296, subd. (a)(1), as amended by initiative measure, Prop. 69, § III, adding Act, § 3.) Because the broad scope of this amendment all but eliminates the likelihood that biological specimens will be mistakenly collected or analyzed, no deterrent effect would be achieved by excluding evidence obtained from a sample mistakenly collected under an earlier version of the Act when the same search would be lawful under current law."

In the complaint John Doe was described by his unique 13-loci DNA profile. That description was incorporated by reference into the arrest warrant.[24]

 Defendant contends the prosecution was not commenced within the six-year statute of limitations because "the 'particularity' requirements of the Fourth Amendment to the United States Constitution, our state Constitution's article I, section 13, and Penal Code section 804, subdivision (d), were not met in the case by the prosecuting authority's use of the unknown suspect's DNA profile, as a description of the unknown suspect, in the 'John Doe' complaint and 'John Doe' arrest warrant."[25] We agree with the Court of Appeal, that "an arrest warrant, which indentifies the person to be arrested by incorporation of the [unique] DNA profile of the assailant, satisfies the statutory particularity requirement of section 804, subdivision (d) read in the light of section 813, subdivision (a) and pertinent constitutional provisions."

### 1. *Relevant Statutory and Constitutional Provisions*

 As relevant here, our statute of limitations provides that "prosecution for an offense punishable by imprisonment in the state prison for eight years or more shall be commenced within six years after commission of the offense" (§ 800), and a felony prosecution is commenced when an arrest warrant is issued, "provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." (§ 804, subd. (d).)

Section 813, subdivision (a), provides, in pertinent part, that "the magistrate shall issue a warrant for the arrest of the defendant" only when "a complaint is filed with a magistrate charging a felony originally triable in the superior court . . . if, and only if, the magistrate is satisfied from the complaint that the offense complained of has been committed and that there is reasonable ground to believe that the defendant has committed it."

Section 815 provides: "A warrant of arrest shall specify the name of the defendant or, if it is unknown to the . . . issuing authority, the defendant may be designated therein by any name." As relevant here, section 959, paragraph 4 similarly provides that "[t]he accusatory pleading is sufficient if it can be

---

[24] A warrant may cross-reference other documents (*Groh v. Ramirez* (2004) 540 U.S. 551, 557 [157 L.Ed.2d 1068, 124 S.Ct. 1284]), and defendant does not claim otherwise.

[25] As the Court of Appeal appropriately noted, defendant "does not claim the [arrest] warrant is unsupported by probable cause, the warrant was improperly executed, or that he was improperly arrested because he was not the person described in the warrant. Indeed at the time the warrant was executed, defendant's true name and identity were known to the officers and he was located using traditional methods of identification. Thus, defendant makes no claim that his arrest was invalid on Fourth Amendment grounds."

understood therefrom" that "the defendant is named, or if his name is unknown, that he is described by a fictitious name, with a statement that his true name is . . . unknown."

The Fourth Amendment to the United States Constitution guarantees that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and *particularly describing* . . . the persons . . . to be seized." (Italics added.) According to the Federal Rules of Criminal Procedure, rule 4(b)(1) (18 U.S.C.), a warrant shall "contain the defendant's name or, if it is unknown, name or description by which the defendant can be *identified with reasonable certainty.*" (Italics added.) The California Constitution, article I, section 13 provides that "a warrant may not issue, except on probable cause . . . particularly describing the . . . persons . . . to be seized."

### 2. *The Particularity Requirement*

Defendant contends a John Doe arrest warrant accompanied by a DNA genetic profile does not constitute "a means of description 'reasonable to the circumstances' " because, rather than "describ[ing]" the person to be arrested, it only "identifies a defendant by the use of a fictitious name without any description whatsoever" and therefore does not describe that person "with sufficient certainty." Defendant argues that a fictitious name or a John Doe name is insufficient to identify anyone, and therefore is insufficient to identify anyone with particularity.

Under both federal and state law, an accusatory pleading or arrest warrant may issue with a fictitious name provided it names or describes the person being charged with reasonable certainty. (See, e.g., *Cabell, supra,* 153 U.S. at p. 85 [an arrest warrant "must truly name [the person charged], or describe him sufficiently to identify him"]; *People v. Montoya, supra,* 255 Cal.App.2d at pp. 142–143; *Ernst v. Municipal Court of Los Angeles* (1980) 104 Cal.App.3d 710, 718 [163 Cal.Rptr. 861].) As the court in *Montoya* explained, "[w]here a name that would reasonably identify the subject to be arrested cannot be provided, then some other means *reasonable to the circumstances* must be used to assist in the identification of the subject of the warrant . . . ." (*Montoya, supra,* 255 Cal.App.2d at p. 142, italics added, citing *U.S. v. Swanner* (E.D.Tenn. 1964) 237 F.Supp. 69, 71, see also *Blocker v. Clark* (1906) 126 Ga. 484 [54 S.E. 1022]; 3 LaFave, Search and Seizure (3d ed. 1996 & Supp. 2003) § 35.1(g).)[26]

---

[26] We note that the court in *Montoya* held that the description in the warrant, " 'John Doe, white male adult, 30 to 35 years, 5'10" 175 lbs. dark hair, medium build' " (*Montoya, supra,* 255 Cal.App.2d at p. 141), was "too general a description [in that case because] [i]t could be applied to a great number of persons in a city the size of Oakland." (*Id.* at p. 143.) By contrast,

■ We first consider whether the arrest warrant that issued in this case satisfied the Fourth Amendment's requirement, as well as our state Constitution's requirement, that a warrant must particularly describe the person to be seized. The relevant language of article I, section 13 of the California Constitution parallels the relevant language of the Fourth Amendment, and "the issue of particularity resolves itself identically under both federal and California standards." (*People v. Tockgo* (1983) 145 Cal.App.3d 635, 640, fn. 2 [193 Cal.Rptr. 503] (*Tockgo*).)

■ In the context of the Fourth Amendment, " '[p]articularity is the requirement that the warrant must clearly state what is sought.' " (*U.S. v. Towne* (9th Cir. 1993) 997 F.2d 537, 544.) "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." (*Payton v. New York* (1980) 445 U.S. 573, 583 [63 L.Ed.2d 639, 100 S.Ct. 1371], fn. omitted.) The particularity requirement of the Fourth Amendment helps to ensure that a search or seizure "will not take on the character of the wide-ranging exploratory searches [or seizures] the Framers intended to prohibit." (*Maryland v. Garrison* (1987) 480 U.S. 79, 84 [94 L.Ed.2d 72, 107 S.Ct. 1013], fn. omitted; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1296 [65 Cal.Rptr.2d 145, 939 P.2d 259] ["The purpose of the 'particularity' requirement of the Fourth Amendment is to avoid general and exploratory searches by requiring a particular description of the items to be seized."].)

However, a warrant "need only be reasonably specific" (*U.S. v. Hayes* (9th Cir. 1986) 794 F.2d 1348, 1354), and "the specificity required 'varies depending on the circumstances of the case and the type of items involved.' " (*U.S. v. Rude* (9th Cir. 1996) 88 F.3d 1538, 1551; see also *U.S. v. Bridges* (9th Cir. 2003) 344 F.3d 1010, 1016; *U. S. v. Jones* (7th Cir. 1995) 54 F.3d 1285, 1289–1290.) The constitutional and statutory requirements of particularity are satisfied if the warrant "imposes a meaningful restriction upon the objects to be seized." (*Burrows v. Superior Court* (1974) 13 Cal.3d 238, 249 [118 Cal.Rptr. 166, 529 P.2d 590].) The requirement of reasonable particularity "is a flexible concept, reflecting the degree of detail available from the facts known to the affiant and presented to the issuing magistrate." (*Tockgo, supra*, 145 Cal.App.3d at p. 640; see *United States v. Ventresca* (1965) 380 U.S. 102, 108–109 [13 L.Ed.2d 684, 85 S.Ct. 741]; *Spinelli v. U.S.* (8th Cir. 1967) 382 F.2d 871, 886, revd. on other grounds (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584].) Here, at the time the John Doe arrest warrant issued and the John Doe complaint was filed in this case, there was

---

as we explain, *post*, a warrant describing the person sought by a unique DNA profile permits identification of the person with the reasonable certainty that is constitutionally required.

no more particular, accurate, or reliable means of identification available to law enforcement than the suspect's unique DNA profile.

In the context of a search of a place, the Fourth Amendment requirement of particularity and our state statutory particularity requirement in section 1525[27] are met "if the description is such that the officer . . . can with reasonable effort ascertain and identify the place intended." (*Steele v. United States No. 1* (1925) 267 U.S. 498, 503 [69 L.Ed. 757, 45 S.Ct. 414]; see *People v. Coulon* (1969) 273 Cal.App.2d 148, 152 [78 Cal.Rptr. 95].) While a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings, the test for determining the validity of a warrant considers "whether any reasonable probability exists that the officers may mistakenly search another premise." (*U.S. v. Mann* (9th Cir. 2004) 389 F.3d 869, 876.)

State courts that have considered the validity of a warrant that described the suspect by his DNA profile have concluded that a unique DNA profile qualifies as a reasonable means of identifying the subject of a warrant or complaint when that DNA profile is the best description available. (See *People v. Martinez* (N.Y.App.Div. 2008) 52 A.D.3d 68 [855 N.Y.S.2d 522] (*Martinez*); *State v. Danley* (Ct.Com.Pl. 2006) 2006 Ohio 3585 [853 N.E.2d 1224] (*Danley*); *State v. Davis* (2005) 2005 WI App 98 [281 Wis.2d 118, 698 N.W.2d 823]; *State v. Dabney* (2003) 2003 WI App 108 [264 Wis.2d 843, 663 N.W.2d 366] (*Dabney*); cf. *State v. Belt* (2008) 285 Kan. 949 [179 P.3d 443, 450] (*Belt*) [approving the practice "in the abstract," but affirming dismissal where charging documents did not set forth suspect's unique DNA profile].) For the reasons stated below, we find these authorities persuasive.

 A warrant or complaint " 'is an accusation against a person, and not against a name,' " and " '[w]hen the name is unknown, the person may be identified with "the best description" available.' " (*Danley, supra*, 853 N.E.2d at p. 1227, quoting, inter alia, *Dabney, supra*, 663 N.W.2d 366; see *Commonwealth v. Laventure* (2006) 586 Pa. 348 [894 A.2d 109, 116, fn. 7] [When a name cannot be provided, " 'some other means reasonable to the circumstances' " may be used to assist in the identification.]; 4 Blackstone, Commentaries 302.)

The *Dabney* court correctly noted that "case law suggests that the complaint and warrant satisfy the sufficiency standard when the description

---

[27] Section 1525 provides that a "search warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person to be searched or searched for, and particularly describing the property, thing, or things and the place to be searched." (See also § 1529 [requiring "reasonable particularity" of the description].)

clearly demonstrates that the 'law enforcement authorities had probable cause to suspect a particular person of committing a crime.' *Powe v. City of Chicago*, 664 F.2d 639, 646 (7th Cir. 1981)." (*Dabney, supra*, 663 N.W.2d at pp. 371–372.) We agree with *Dabney* that, "for purposes of identifying 'a particular person' as the defendant, a DNA profile is arguably the most discrete, exclusive means of personal identification possible." (*Id.* at p. 372; accord, *Danley, supra*, 853 N.E.2d at p. 1227.) As the *Dabney* court explained, " 'A genetic code describes a person with far greater precision than a physical description or a name.' Meredith A. Bieber, Comment, *Meeting the Statute or Beating It: Using 'John Doe' Indictments Based on DNA to Meet the Statute of Limitations*, 150 U. Pa. L.Rev. 1079, 1085 (2002)." (*Dabney, supra*, 663 N.W.2d at p. 372.)

In *Belt*, the Supreme Court of Kansas recently considered whether a John Doe arrest warrant that describes the suspect by a unique marker profile on a DNA autoradiograph identifies the suspect with sufficient particularity and reasonable certainty to satisfy the requirements of the Fourth Amendment to the United States Constitution and its state's statutory codification of that constitutional standard with regard to Kansas arrest warrants (Kan. Stat. Ann. § 22-2304(1)). (*Belt, supra*, 179 P.3d at pp. 449–450.) Quoting *Cabell, supra*, 153 U.S. at page 85, *Belt* first noted that "there is precedent to support the contention that a warrant need not provide the name of a suspect, so long as it describes the suspect 'sufficiently to identify' him or her." (*Belt, supra*, 179 P.3d at p. 449.) Although the state conceded that the particular warrants at issue in *Belt* contained insufficient identifying information because, at most, they "mentioned only DNA loci common to all humans" (*ibid.*), *Belt* stated that, "in the abstract," it agreed with "the proposition that a warrant identifying the person to be arrested for a sexual offense by description of the person's unique DNA profile, or incorporating by reference an affidavit containing such a unique profile, can satisfy constitutional and statutory particularity requirements." (*Id.* at p. 450.)

For purposes of the Fourth Amendment, we conclude that the arrest warrant in question, which described the defendant by his 13-loci DNA profile and included an explanation that the profile had a random match probability such that there was essentially no chance of its being duplicated in the human population except in the case of genetically identical sibling, complied with the mandate of our federal Constitution that the person seized be described with particularity.[28] (*Maryland v. Garrison, supra*, 480 U.S. at

---

[28] In *People v. Nelson, supra*, 43 Cal.4th at page 1262, footnote 1, we recently noted that "some courts have suggested that, when the odds are like those here, it might be appropriate

p. 84.)[29] For the reasons stated above, we likewise conclude the arrest warrant in question described the defendant with sufficient particularity to avoid a violation of the warrant particularity requirement of our state Constitution. (Cal. Const., art. I, § 13.)

■ We now turn to the specific particularity requirement set forth in section 804, subdivision (d), namely, that, a felony prosecution is "commenced" when an "arrest warrant is . . . issued," "provided the warrant names or *describes the defendant with the same degree of particularity required for an indictment, information, or complaint*." (Italics added.) The statutory scheme that allows a qualifying arrest warrant to commence prosecution for purposes of the statute of limitations clearly incorporates the standards of particularity required by our state and federal Constitutions. The specific rules by which the sufficiency of our state accusatory pleadings, including an indictment, information, and complaint, is determined are prescribed in our Penal Code. (§ 948.) While an accusatory pleading must specify the "names of the parties" (§ 950), the code provides that, "[w]hen a defendant is charged by a fictitious or erroneous name, and in any stage of the proceedings his true name is discovered, it must be inserted in the subsequent proceedings, referring to the fact of his being charged by the name mentioned in the accusatory pleading." (§ 953.) With regard to the name of the accused, section

for [an] expert to testify that, except for identical twins or maybe close relatives, ' "it can be concluded to a reasonable scientific certainty that the evidence sample and the defendant sample came from the same person." ' "

In those rare cases in which an arrest warrant is issued describing the suspect by his DNA profile and it is later discovered that he has a genetically .identical sibling, the DNA profile described in the arrest warrant may not match only that of the perpetrator of the crime in question. Here, the record contains no expert testimony regarding the likelihood that a suspect described in such a warrant will have an identical sibling, nor is there testimony addressing the likelihood that the 13-loci DNA profiles of identical siblings will be genetically identical. We therefore do not address the significance, if any, of the possibility that a suspect described in a DNA-profile arrest warrant may have a genetically identical sibling. We note that, when our Legislature specifically focused its attention on DNA in the context of certain sexual offenses and the statute of limitations, it explicitly recognized that the threat of prosecution for an indefinite period of time may be warranted once the DNA of a suspect has been collected. (See § 803, subd. (g)(1).)

[29] We note that the constitutional requirement that the subject of an indictment, complaint, or warrant be identified therein with particularity has nothing to do with notice to the subject that a warrant has issued or charges have been filed. The subject receives notice when a warrant is executed, or an accusatory pleading is served, and no other notice is necessarily required. (See, e.g., *U.S. v. Muse* (2d Cir. 1980) 633 F.2d 1041, 1043–1044 [absent prejudice, sealed indictment is timely though defendant was not apprehended and indictment was not made public until after limitations period expired]; Fed. Rules Crim.Proc., rule 6(e)(4), 18 U.S.C. [allowing sealing of timely filed indictment until defendant is in custody].) The constitutional particularity requirement guards against general arrest warrants and mistaken execution or service against the wrong persons. As discussed *ante*, a warrant limited by the unique DNA profile of the intended subject is not a general warrant because there almost no likelihood that a description so specific will lead to an erroneous arrest or prosecution.

959 similarly provides that an "accusatory pleading is sufficient if it can be understood therefrom: [¶] . . . [¶] 4. That the defendant is named, or if his name is unknown, that he is described by a fictitious name, with a statement that his true name is to the grand jury, district attorney, or complainant, as the case may be, unknown." Section 960 provides that "[n]o accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."

In *People v. Erving* (1961) 189 Cal.App.2d 283 [11 Cal.Rptr. 203], the indictment charged " 'Jane Doe (Charlene)' " and described her as " 'female Negro, 39 years, 5'7", weight 165 pounds, olive complexion.' " (*Id.* at p. 284.) The court found meritless defendant's argument that the indictment was "defective in that the person allegedly indicted was not adequately named or described in the indictment so that she could be identified," although the prosecution conceded that the indictment contained an erroneous weight (165 pounds instead of 110 pounds) and there was some dispute regarding her complexion. (*Id.* at p. 290.) Citing *Erving*, the court in *People v. McCrae* (1963) 218 Cal.App.2d 725 [32 Cal.Rptr. 500], similarly rejected an argument that "the accused was not adequately named or described so that he could be identified as the defendant herein." (*Id.* at p. 728.) In *McCrae*, the defendant was charged by the fictitious name of " 'John Doe "Bill" ' " and described as " 'Male Negro, 30–35 yrs., 5'7"–5'10", 150–160 lbs., black hair, brown eyes,' " while his true name was William Martin McCrae and his own description of himself corresponded closely, though not exactly, with that set forth in the indictment. (*Id.* at p. 728; see also *People v. Le Roy* (1884) 65 Cal. 613, 615 [4 P. 649] [fact that defendant was designated by different names in the information was not a ground for setting it aside under § 995].) The court in *McCrae* cited an early case of this court, *People v. Kelly* (1856) 6 Cal. 210, which, in upholding the constitutionality of section 953 and discussing how it avoids the delay and expense of remanding a prisoner for a new indictment when a misnomer is found, observed that "names are but sounds to designate particular individuals, and, as such, are employed to describe the person charged with the crime," and that use of a name in an accusatory pleading, such as an indictment, "is only designed to identify the person." (*Kelly*, at p. 213.) Here, we conclude the use of a fictitious name and the description of defendant's unique DNA profile adequately described defendant with the particularity required for an indictment, information, or complaint under section 950 et seq.

We simply add that, in any event, the fact that defendant was first described by a fictitious name and his unique DNA profile "did not tend to prejudice the substantial rights of the defendant." (*People v. Goscinsky* (1921) 52 Cal.App. 62, 64 [198 P. 40].) The fact that defendant was so identified

until a "cold hit" match provided his true name "in no way interfered with his defense to the charge" or created "a miscarriage of justice." (*Ibid.*)

 We conclude that, when there is no more particular, accurate, or reliable means of identification available to law enforcement, an arrest warrant or a complaint that describes the person to be arrested by a fictitious name and his unique DNA profile, or incorporating by reference an affidavit containing such a unique DNA profile, satisfies the particularity requirements of the Fourth Amendment, the California Constitution, and subdivision (d) of section 804.[30]

### C. The Statute of Limitations

Defendant contends the California Legislature has indicated a "clear intent that neither a 'John Doe' complaint nor a 'John Doe, arrest warrant can timely commence a criminal action and thereby satisfy a statute of limitations." He claims the John Doe warrant that issued regarding the offenses perpetrated against Deborah L. "circumvented" the limitations period intended by the Legislature and denied him "due process under the Fourteenth Amendment and the state Constitution." Defendant acknowledges this discrete argument is based solely on the fact that "the complaint and the arrest warrant both were in the name of defendant 'John Doe,' an unknown suspect." He correctly concedes that section 815 permits a John Doe warrant to issue when the defendant's name is unknown, but he poses the question "whether our Legislature meant section 815 to coexist in harmony with section 804, so that the action against [him] could commence with the filing of a 'John Doe' complaint or the issuance of a 'John Doe' arrest warrant."

In our discussion of the particularity requirements for an arrest warrant or a complaint, we impliedly answered defendant's question in the affirmative. We explicitly do so below.

 In part 2, title 3, chapter 4 of our Penal Code, which deals with arrest warrants, section 815 provides, in relevant part, that "[a] warrant of arrest shall specify the name of the defendant or, if it is unknown to the . . . issuing authority, the defendant may be designated therein by any name."

---

[30] Like the constitutional requirement, the statutory particularity requirement does not mean the defendant must have notice, within the limitations period, that prosecution has commenced. Instead, the statutory requirement, which the Legislature could abandon entirely, simply guards against stale claims by establishing that the state has not slept on its rights, or skirted the limitations period by initiating a shell action against nobody in particular. The requirement ensures that a prosecution has validly commenced, within the period set by law, against the specific person the authorities believe to have committed the subject crimes. Again, a warrant or complaint that identifies the charged suspect by his unique DNA profile satisfies these concerns.

Section 804 provides, in relevant part, that, "for the purpose of this chapter, prosecution for an offense is commenced when any of the follow occurs: [¶] . . . [¶] (d) An arrest warrant or bench warrant is issued, provided the warrant *names or describes* the defendant with the same degree of particularity required for an indictment, information, or complaint." (Italics added.)

"Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) We must look to the statute's words and give them their usual and ordinary meaning. (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) The statute's plain meaning controls the court's interpretation unless its words are ambiguous." (*Green v. State of California* (2007) 42 Cal.4th 254, 260 [64 Cal.Rptr.3d 390, 165 P.3d 118].)

 By its plain language, section 815 allows an arrest warrant to issue designating the defendant by a fictitious name if the defendant's name is unknown. By its plain language, section 804 explains that the prosecution for an offense commences when an arrest warrant is "issued" that "describes the defendant with the same degree of particularity required for an indictment, information, or complaint." (§ 804, subd. (d).) Nothing in the plain language of either section 815 or section 804, subdivision (d), suggests that the latter statutory provision was intended to exclude arrest warrants that designate the defendant by a fictitious name but describe the defendant with the required particularity from the general category of arrest warrants that commence a prosecution and thereby satisfy the statute of limitations. We see no reason not to give effect to the plain language in both statutes, and we find nothing in the plain language of the two statutes that suggests they do not coexist in harmony.[31]

We are aware that defendant relies upon the 1984 California Law Revision Commission's comment to section 804 that "[i]ssuance of a 'Doe' warrant does not reasonably inform a person that he or she is being prosecuted and therefore does not satisfy the statute of limitations." (Recommendation Relating to Statutes of Limitation for Felonies (Jan. 1984) 17 Cal. Law Revision Com. Rep. (1984) p. 322 [com. on Pen. Code § 804]; hereafter, Law Revision Commission comment.) That comment goes on to state that "[i]f the name specified in the warrant is not the precise name of the defendant, *it is sufficient that the name identifies the defendant with reasonable certainty.*" (*Ibid.,* italics added.)

---

[31] In that regard, we simply note that our Legislature has not insisted that a warrant be executed, or that the suspect receive notice a prosecution has commenced, within the applicable limitations period. The statutes require only that prosecution must commence within a specified time, and does commence for this purpose upon *issuance* of a warrant that either names the suspect or describes him or her with the requisite particularity.

■ First, as defendant recognizes, official comments of the California Law Revision Commission, while persuasive, are " 'not conclusive[] evidence of [legislative] intent.' " (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 12–13, fn. 9 [50 Cal.Rptr.3d 585, 145 P.3d 462].) We simply note that the only two cases cited by the commission immediately after the portion of the comment relied upon by defendant do not stand for the proposition that a John Doe warrant that describes a defendant with reasonable certainty cannot satisfy the statute of limitations. Instead, both cases hold there is no due process violation when a defendant is charged by a fictitious or erroneous name if the true name is inserted in subsequent proceedings pursuant to section 953. (See *People v. McCrae, supra,* 218 Cal.App.2d 725; *People v. Erving, supra,* 189 Cal.App.2d 283.) The defendants in those two cases claimed the Doe indictments under which they were initially brought before the court were technically deficient because they failed to establish that the Does named therein, and the respective defendants themselves, actually were the same. The Courts of Appeal found that the physical descriptions and other facts set forth in the indictments, as well as the sworn testimony of the involved law enforcement officers, left no doubt the defendants were the specific individuals to whom the indictments referred. Here, the use of the defendant's unique DNA profile had the same effect.

Second, neither the Legislature nor the official comment of the California Law Revision Commission discusses the precise issue before us, which is whether a fictitious name such as John Doe, *when coupled with the unique DNA profile of the defendant,* identifies the defendant with reasonable certainty such that the warrant reasonably informs the person that he or she is being prosecuted. As to this precise question, we reach the same conclusion reached by the New York appellate court in *Martinez, supra,* 855 N.Y.S.2d 522, which held that "an indictment that identifies a defendant solely by his or her [unique] DNA markers satisfies the defendant's constitutional right to notice." (*Id.* at p. 523.)[32]

---

[32] However, we agree with the following portion of the Law Revision Commission comments to section 804: "Nothing in subdivision (d) limits the constitutional due process and *speedy trial requirements that the warrant be executed without unreasonable delay.* [Citation.]" (Law Revision Com. com., *supra,* 17 Cal. Law Revision Com. Rep., p. 323.) We note that the Court of Appeal held that defendant failed "to establish prejudice for the three-week delay between August 25, 2000, when the statute of limitations was set to expire, and September 15, the day he was arrested." (See *People v. Archerd* (1970) 3 Cal.3d 615, 640 [91 Cal.Rptr. 397, 477 P.2d 421] [to show due process violation defendant must show absence of any legitimate reason for delay and prejudice].) As the Court of Appeal noted, defendant simply raised questions about the possibility that someone with a DNA profile matching the one specified in the warrant might not be found for decades, impairing his ability to establish a defense. That is not the case here, where law enforcement promptly processed the crime scene on the day of the crime, collected evidence, took a vaginal swab from the victim, and developed a DNA

In the New York state trial court, defendant Martinez had argued that the John Doe designation accompanied by the DNA profile "was defective inasmuch as it did not 'name a person' and did not 'adequately describe' him"; that he was "given 'inadequate notice' that he was accused of a crime because he did not know his own DNA profile"; that he "had been denied his constitutional right to a speedy trial"; and that "the statute of limitations had lapsed." (*Martinez, supra,* 855 N.Y.S.2d at p. 524.) After noting that some of these claims had been waived by the defendant, the appellate court rejected each claim on the merits by reasoning as follows: "The right to notice that a defendant is entitled to by indictment is the right to 'fair notice of the accusations made against him, so that he will be able to prepare a defense' [citation]. This function of the indictment is founded on the notice requirement of . . . our State Constitution as well as the 6th Amendment to the Federal Constitution. To satisfy this notice requirement, the indictment must allege all the legally material elements of the charged crime and state that defendant in fact committed the acts which comprise the elements. The 'basic essential function of an indictment . . . is simply to notify the defendant of the crime of which he stands indicted' [citation]." (*Id.* at p. 525.)

The *Martinez* court explained that, "given the advances in science, the practice of indicting by DNA is starting to take a foothold in this country's criminal justice system [citation]." (*Martinez, supra,* 855 N.Y.S.2d at p. 525.) The court's review of the status of DNA indictments throughout the country is thorough, and we incorporate it here as part of our analysis: "Some states have employed non-statutory DNA indictments, but in addition to the federal legislation (18 USC § 3282) there are four states utilizing statutory DNA indictments. The non-statutory states include Wisconsin [citation] and Massachusetts [citation]. Examples of legislative implementation of DNA indictments include Ark. Code Ann. § 5-1-109(b)(1)(B),(i)–(j); Del. Code Ann. tit. 11, § 3107(a); Mich. Comp. Laws § 767.24(2)(b); N.H. Rev. Stat. Ann. § 592-A:7(II); and 18 USC § 3282. States in which a genetic material has been indicted (see Moyer & Anway, *Biotechnology and the Bar: A Response to the Growing Divide Between Science and the Legal Environment,* 22

---

profile for the assailant within the period of limitations. Defendant was arrested a mere three weeks after the expiration of that period. His sole defense was to contest the reliability of the statistical probability evidence. Thus, the Court of Appeal properly concluded that defendant's "ability to defend against the charges was not impaired by the passage of time." In any event, this due process issue is not before us. (See *People v. Nelson, supra,* 43 Cal.4th at pp. 1249–1257; *People v. Catlin* (2001) 26 Cal.4th 81, 107 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Martinez* (2000) 22 Cal.4th 750, 765 [94 Cal.Rptr.2d 381, 996 P.2d 32].)

Berkeley Tech. [L.J.] 671, 688 [(2007)]) include California,[33] Texas, Wisconsin, North Dakota, Pennsylvania, Oklahoma, New York, Utah, Missouri and Kansas [citation]." (*Martinez, supra*, at pp. 525–526, italics omitted.)

We agree with the court in *Martinez* that, "[a]bsent a constitutional or statutory prohibition, a DNA indictment is an appropriate method to prosecute perpetrators of some of the most heinous criminal acts. Indeed, the prevalence of DNA databanks today as a criminal justice tool supports the conclusion that a defendant can be properly identified by a DNA profile, especially in light of the accuracy of this identification. The chance that a positive DNA match does not belong to the same person may be less than one in 500 million (see Moyer & Anway, *supra*, 22 Berkeley Tech. LJ at 684 n. 64). Therefore, in the instant case, given the nature of the crime, the notice of the charges received by defendant was 'reasonable under all the circumstances' [citation]." (*Martinez, supra*, 855 N.Y.S.2d at p. 526.) We also agree with *Martinez* that a defendant's "constitutionally grounded right to fair notice of the crime of which he is accused is not dependent on the subjective capacity of defendant to understand it. Just as defendant is not required to be literate for a written indictment to be valid, he is not required to be a geneticist to be subject to indictment by DNA profile." (*Ibid.*)

Defendant's argument to the contrary, there is no material difference between the words "description" and "identification" that would alter our analysis. The only difference is semantic. As relevant here, the Oxford English Dictionary defines "describe" in its "ordinary current sense" as "to give a detailed or graphic account of" "by reference to qualities, recognizable features, or characteristic marks." (4 Oxford English Dict. (2d ed. 1989) p. 511.) That dictionary's general definition of "describe" is "[t]o write down, set forth in writing, *or* in written words." (*Ibid.*, italics added.) Identification is the act of identifying, and a relevant definition of "identify" is "[t]o ascertain the origin, nature, or definitive characteristics of." (American Heritage Dict. (4th ed. 2000) p. 871.) A relevant definition of "characteristic" is a "distinctive mark, trait, or feature; a distinguishing or essential peculiarity or quality." (3 Oxford English Dict. (2d ed. 1989) p. 33.) As the Court of Appeal aptly noted, "it cannot be disputed that DNA analysis is as close to an infallible measure of identity as science can presently obtain." " 'A genetic code describes a person with far greater precision than a physical description or a name,' " as physical characteristics can be altered in an attempt to avoid criminal accountability, but a DNA profile cannot. (*Dabney, supra*,

---

[33] We presume the reference to California was based on the Court of Appeal opinion in this case, an opinion that no longer is citable as representing our state's nonstatutory position on DNA warrants or complaints.

663 N.W.2d at p. 372; see also *Danley, supra,* 853 N.E.2d at p. 1227; *Belt, supra,* 179 P.3d at p. 450.)[34]

The Court of Appeal correctly pointed out that, "[i]n passing the [Act], the California Legislature found that '(DNA) and forensic identification analysis is a useful law enforcement tool for identifying and prosecuting sexual and violent offenders.' (Former § 295, subd. (b)(1), as added by Stats. 1998, ch. 696, § 2; see also *People v. King*[, *supra,*] 82 Cal.App.4th [at p.] 1378 [finding there is no question but that DNA testing provides an efficient means of identification].) Similar findings have been made by all other states and the federal government, which have enacted DNA database and data bank acts. (*Alfaro v. Terhune*[, *supra,*] 98 Cal.App.4th [at p.] 505; see Annot., Validity, Construction, and Operation of State DNA Database Statutes (2000) 76 A.L.R. 5th 239, 252; 42 U.S.C. §§ 14131–14134.)" While a DNA profile match does not guarantee that the individual matched is guilty of the charged offense, studies have shown that the chance a positive match does not belong to the same person may be less than one in 500 million. (*Martinez, supra,* 855 N.Y.S.2d at p. 526, citing Moyer & Anway, *Biotechnology and the Bar: A Response to the Growing Divide Between Science and the Legal Environment, supra,* 22 Berkeley Tech. L.J. at p. 684, fn. 64.)

■ Defendant argues that, because a DNA profile merely provides information about genetic makeup not apparent to the naked eye, an arrest cannot be readily executed. However, the intent of the particularity requirement is to "prevent[] the seizure of one thing under a warrant describing another," and to ensure that "nothing is left to the discretion of the officer executing the warrant." (*Marron v. United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 48 S.Ct. 74].) The requirement of particularity is satisfied and preserved by incorporation of a suspect's unique DNA profile in an arrest warrant. "No matter how well a warrant describes the individual, extrinsic information is commonly needed to execute it. If a name is given, information to link the name to the physical person must be acquired." (*Dabney, supra,* 663 N.W.2d at p. 372; see also *Danley, supra,* 853 N.E.2d at p. 1228; *U.S. v. Doe* (3d Cir. 1983) 703 F.2d 745, 748.) Here, given the reliability of a DNA profile, the requirement of particularity is satisfied although extrinsic information is needed to enable law enforcement officers to execute an arrest warrant based on a fictitious name and DNA profile. (See *U.S. v. Doe, supra,* 703 F.2d at p. 747 [even with a detailed written description on a warrant, extrinsic information will be necessary to execute it].)

In light of the above, we conclude that the prosecution in this case was properly commenced within the six-year period of limitations by the filing of

---

[34] Even a Social Security number may not accurately describe an individual because a person's Social Security number may be false, stolen, or altered.

the John Doe arrest warrant that described the person suspected of committing the offenses perpetrated against Deborah L. solely by his unique DNA profile and its random match probability.

## DISPOSITION ·

We remand the matter to the Court of Appeal, Third District, with directions to remand the matter to the trial court with directions to amend the abstract of judgment and the minute order of sentencing to reflect the correct Penal Code section and subdivision for forcible oral copulation. In all other respects, the judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., and Corrigan, J., concurred.

**MORENO, J.,** Concurring and Dissenting.—I dissent from that portion of the majority opinion that holds that the statute of limitations is satisfied by the filing of a "John Doe" arrest warrant that identifies the suspect by only a DNA profile. As explained below, the original arrest warrant filed in this case was not a true warrant because it did not actually authorize the arrest of anyone; it was a clever artifice intended solely to satisfy the statute of limitations until the identity of the perpetrator could be discovered. When this occurred, through a "cold hit" match of defendant's DNA, the arrest warrant was amended to reflect defendant's name and only then, after the statute of limitations had expired, did the warrant become effective and permit defendant to be arrested.

On August 25, 1994, Deborah L. was raped in her home by an unknown assailant. It was dark and the victim could provide only a general description of her attacker as a male of Hispanic or African-American descent with a "medium black complexion," appearing to be in his twenties, approximately 5'7" tall, weighing about 180 pounds, with brown eyes. A semen sample was recovered from her vagina when she was treated for her injuries shortly after the crime. Sacramento Police Detective Peter Willover was assigned as the lead investigator, but the file lay on his desk, unsolved, for nearly six years.

In 2000, Detective Willover was aware that the statute of limitations would soon expire[1] and spoke to the prosecutor about "the possibility of doing some DNA work on cases that were about to expire in statute of limitations." Detective Willover had requested that the semen sample be analyzed for DNA in 1994, but he did not know if such an analysis had been conducted. Because advances had been made in DNA technology, he again requested that the sample be tested.

---

[1] Penal Code section 800 provides that the statute of limitations for this crime expires "six years after commission of the offense."

On August 21, 2000, four days before the statute of limitations was to expire, a felony complaint was filed charging "JOHN DOE unknown male with Short Tandem Repeat (STR) Deoxyribonucleic Acid (DNA) Profile at the following Genetic Locations, using the COfiler and Profiler Plus Polymerase Chain Reaction (PCR) amplification kits: D3S1358 (15, 15), D16S539 (9, 10), THO1 (7, 7), TPOX (6, 9), CSF1PO (10, 11), D7S820 (8, 11), vWa (18, 19), FGA (22, 24), D8S1179 (12, 15), D21S11 (28, 28), D18S51 (20, 20), D5S818 (8, 13), D13S317 (10, 11)" with rape and four related sexual offenses against the victim on August 25, 1994.

On August 22, 2000, Detective Willover executed a declaration in support of an arrest warrant for John Doe stating that "DNA was extracted from the sperm fraction obtained and this DNA was typed at 13 genetic locations." The declaration recited the above quoted DNA profile that was included in the complaint. An arrest warrant was issued that day for "JOHN DOE," describing him only as a Black male. A related document stated, under the designation "REMARKS": "SUSPECT IDENTIFIABLE BY GENETIC PROFILE IN SACRAMENTO POLICE DEPARTMENT REPORT [94-]70626. CONTACT SPD DET. PETE WILLOVER [telephone number] OR SACRAMENTO DISTRICT ATTORNEY'S ADULT SEXUAL ASSAULT UNIT [telephone number]."

On September 15, 2000, an analysis of defendant's DNA resulted in a "cold hit" match with the DNA profile obtained from the semen recovered from the victim in this case. On September 18, 2000, more than six years after the victim was sexually assaulted, the complaint and the arrest warrant were amended to replace the "John Doe" designation and DNA profile with the name of defendant, Paul Robinson, and defendant was arrested.

On November 20, 2000, defendant filed a motion to dismiss on the ground that the statute of limitations had expired before the amended complaint was filed. At a subsequent hearing, the district attorney who prepared the original complaint and arrest warrant testified that the suspect's DNA profile had not been entered on the face of the arrest warrant because "the way the computer system is set up, it will not take that many characters in identifying information." She agreed that a peace officer would not have had enough information to make an arrest based upon the arrest warrant alone without contacting her or Detective Willover.

A clerk in the warrants section of the Sacramento Police Department testified that standard procedure includes entering a felony arrest warrant in either the "California wanted persons or NCIC, which is nationwide want[ed] persons system," but it is not possible to do so without certain "mandatory information," which includes "the name, sex, date of birth, [and] height."

Neither warrant system permits entry of a DNA profile. Accordingly, the arrest warrant in the present case had not been entered into either the statewide or national system because there were "not enough criteria for entry." The clerk explained: "There would be really nothing for us to do. There is not enough information here to go forward with any of the record checks."

Standard procedure also includes assigning a peace officer to execute the warrant. The warrant in the present case had not been assigned to an officer because "[t]here was not enough information to assign it to anybody . . . ." When asked whether she would have assigned the arrest warrant to an officer to execute if a DNA profile had appeared on the face of the warrant, the clerk replied she would not, because "I know nothing about DNA."

Detective Willover acknowledged that the original arrest warrant did not authorize the arrest of any individual, stating: "I would not, as a peace officer, arrest somebody just on the face of this" because the arrest warrant "doesn't identify the individual named in the warrant." If an officer had telephoned him, as called for in the "Remarks" section of the document accompanying the warrant, Detective Willover testified he "would explain to the officer it is a warrant in the name of John Doe due to the fact we don't know who the individual is, and I would explain to the officer that most likely we have not had a DNA hit yet and there is nobody to arrest." It was not until September 15, 2000, when he received word from the crime lab that defendant's DNA had been matched to the semen sample, that there was sufficient information to arrest anyone based upon the arrest warrant.

The detective admitted that the only reason to issue the arrest warrant was to prevent the statute of limitations from expiring:

"Q. Detective, you testified you knew you could not execute the warrant until after a match; is that correct?

"A. Yes, sir.

"Q. Why is that?

"A. I didn't know who the person was.

"Q. So why did you get the warrant? [¶] . . . [¶]

"[A.] I was aware that once a warrant is issued on the case, a statute of limitations would not expire as long as you showed due diligence. In my mind, I was hoping to be able to identify and prosecute the person who committed these crimes."

In my view, the trial court should have granted the motion to dismiss because the prosecution of defendant was not commenced until after the statute of limitations had expired. The arrest warrant that was issued a few days before the statute of limitations expired was not a true arrest warrant; it was a mere placeholder, because it did not authorize the arrest of any individual. It was not until the warrant was amended to replace the name John Doe and the reference to the DNA profile with defendant's name that the warrant became effective and the prosecution commenced; but this was too late, because the statute of limitations had already expired.

I do not impugn the motives of Detective Willover or the prosecutor. They made an inventive attempt to continue investigating a serious crime. But permitting this attempt to succeed creates a large loophole in the statute of limitations that the Legislature did not intend.

Statutes of limitation are not required by either the state or federal Constitutions, and "[t]here is no statute of limitations for murder, embezzlement of public funds, and certain other offenses punishable by life imprisonment. [Citation.]" (*People v. Frazer* (1999) 21 Cal.4th 737, 743 [88 Cal.Rptr.2d 312, 982 P.2d 180]; see *id.* at pp. 769–770.) The interests of the state protected by statutes of limitation "include both societal repose and the protection of individuals whose means of defense might be impaired by the passage of time. [Citations.]" (*Id.* at p. 770.) Statutes of limitation "encourage the swift and effective enforcement of the law, hopefully producing a stronger deterrent effect." (*People v. Zamora* (1976) 18 Cal.3d 538, 547 [134 Cal.Rptr. 784, 557 P.2d 75].) "[A]doption of a period of limitation represents a legislative recognition that for all but the most serious of offenses (such as murder or kidnapping) a never-ending threat of prosecution is more detrimental to the functioning of a civilized society than it is beneficial. [Citations.]" (*Ibid.*)

"California's criminal statutes of limitation were first enacted in 1851 and codified in 1872." (*People v. Frazer, supra,* 21 Cal.4th at p. 743.) In 1981, the Legislature directed the California Law Revision Commission (sometimes hereafter Commission) to study the statutes of limitations and make recommendations. (Stats. 1981, ch. 909, § 3, p. 3443.) As a result, "[t]he entire scheme . . . was overhauled in 1984. [Citation.]" (21 Cal.4th at p. 743; see Stats. 1984, ch. 1270, § 2, p. 4335.)

The Law Revision Commission began its recommendations by examining the functions of statutes of limitations in felony prosecutions: "The preeminent function of a felony limitations statute is to protect a person accused of crime both from having to face charges based on evidence that may be unreliable and from losing access to the evidentiary means to defend against

the accusation. . . . [W]ith the passage of time, memory becomes less reliable, witnesses die or become otherwise unavailable, and physical evidence becomes more difficult to obtain . . . ." (Recommendation Relating to Statutes of Limitation for Felonies (Jan. 1984) 17 Cal. Law Revision Com. Rep. (1984) p. 308 (hereafter Recommendation).)

The Law Revision Commission carefully explained why it recommended that certain acts should be deemed to commence prosecution sufficient to satisfy the statute of limitations: "The statute should be satisfied when the accused is informed of the decision to prosecute and the general nature of the charge with sufficient promptness to allow the accused to prepare a defense before evidence of his or her innocence becomes weakened with age. Actions that satisfy this general standard should amount to commencement of prosecution for the purpose of the statute of limitations." (Recommendation, *supra*, at p. 316.) The Commission concluded that the "finding of an indictment, the filing of an information, and the certification of a case to the superior court are all acts that commence prosecution," stating: "Each of these events marks a formal decision by the prosecution as to the general nature of the charge and the identity of the accused, *and will ordinarily come to the attention of the accused.*" (*Ibid.*, italics added.)

The Commission's reason for adding the filing of an arrest warrant to the list of actions that commence a prosecution and satisfy the statute of limitations stemmed, in part, from its recommendation that the statute of limitations no longer be tolled while the suspect is absent from the jurisdiction. The Commission recommended that instead of tolling the statute of limitations while the suspect is absent from the jurisdiction, "the statute of limitations can be satisfied by issuing a warrant for arrest of the person." (Recommendation, *supra*, at p. 315.) But issuing an arrest warrant would satisfy the statute of limitations only if "the warrant specifies the name of the defendant or identifies and describes the defendant with sufficient particularity. Otherwise there is the possibility that a 'Doe' warrant would satisfy the statute *without ever reasonably informing a person that he or she is being prosecuted.*" (*Id.* at p. 316, italics added.)

The Law Revision Commission recommended that Penal Code section 804, subdivision (d)[2] be added to provide that "prosecution for an offense is commenced when . . . [¶] . . . [¶] (d) An arrest warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." (Recommendation, *supra*, at p. 322.) The Commission added a comment explaining that the warrant must "specify the name of the defendant or describe the defendant

---

[2] Further undesignated statutory references are to the Penal Code.

with particularity" because "[i]ssuance of a 'Doe' warrant does not reasonably inform a person that he or she is being prosecuted and therefore does not satisfy the statute of limitations." (*Ibid.*) The Legislature enacted section 804 exactly as the Commission proposed, except for adding the words "or bench warrant" to subdivision (d). (Stats. 1984, ch. 1270, § 2, pp. 4335, 4336.)

"Because the official comments of the California Law Revision Commission 'are declarative of the intent not only of the draftsman of the code but also of the legislators who subsequently enacted it' [citation], the comments are persuasive, albeit not conclusive, evidence of that intent [citation]." (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 148 [132 Cal.Rptr.2d 341, 65 P.3d 807].) Nothing in the legislative history of section 804, subdivision (d), runs counter to the above quoted comment. Nothing in that history suggests that the Legislature intended that the filing of a "John Doe" arrest warrant that refers to a DNA profile would satisfy the statute of limitations. Rather, it is abundantly clear that such a warrant is deficient for statute of limitations purposes, because it "does not reasonably inform a person that he or she is being prosecuted and therefore does not satisfy the statute of limitations." (Recommendation, *supra*, at p. 322.)

The majority reasons that the arrest warrant was sufficient because the reference to a DNA profile prevented the warrant from being a "general warrant, upon which any other person might as well have been arrested." (*West v. Cabell* (1894) 153 U.S. 78, 86 [38 L.Ed. 643, 14 S.Ct. 752].) I agree that this was not a general warrant. The flaw here is not that the warrant authorized the arrest of too many people, but that it authorized the arrest of no one at all.

The majority acknowledges that the statute of limitations would not be satisfied by "initiating a shell action against nobody in particular." (Maj. opn. *ante*, at p. 1137, fn. 30.) It is true that the DNA warrant in this case was aimed at one particular suspect, but it still was a shell action, because the prosecution did not yet know the identity of that suspect. In fact, the prosecution likely would never had been able to identify the suspect had he not been arrested for a new crime and been forced to provide a blood sample. The investigating officer candidly admitted that the warrant was not intended to authorize the arrest of anyone until a match had been found for the DNA sample. The Attorney General states that "until a match was made, the warrant could not be executed." When that happened, the warrant was amended to reflect defendant's name and then, and only then, was it transformed from a shell action into a true warrant that could authorize the arrest of a person.

The majority concludes that the DNA arrest warrant satisfied section 804, which requires that the warrant "describe" the defendant with particularity. I

disagree. The original arrest warrant in the present case did not describe the defendant at all, because it gave no means for a peace officer attempting to execute the warrant to recognize the defendant and make an arrest. The Oxford English Dictionary defines the word "describe" as follows: "To set forth in words, written or spoken, by reference to qualities, recognizable features, or characteristic marks; to give a detailed or graphic account of. (The ordinary current sense.)" (4 Oxford English Dict. (2d ed. 1989) p. 511, col. 3.) A DNA profile does not consist of words and does not refer "to qualities, recognizable features, or characteristic marks." A DNA profile can be used to identify a person, in the same sense that a valid Social Security number can identify an individual, but neither a Social Security number nor a DNA profile "describes" that person.

Unlike a detailed physical description, a DNA profile neither describes the suspect in the conventional sense that would permit an arresting officer to recognize and arrest the suspect, nor identifies a particular person. At most, a DNA profile is information that can be used to identify a suspect once a DNA match is made, but it is not a substitute for the detailed physical description required in a "John Doe" warrant.

The rule the majority creates does not result in an injustice in this particular case. To the contrary, defendant is guilty of heinous crimes and deserves the punishment he will receive. But the effect of the majority's rule is not limited to this case. It will permit this type of sham arrest warrant to be used to circumvent the statute of limitations in any criminal prosecution in California in which biological evidence is left at the crime scene from which DNA can be extracted. Our ruling is not limited to situations like the present case in which DNA is extracted from semen recovered from a rape victim. It would apply equally if a human hair is found at the crime scene from which DNA can be extracted, or if the suspect left blood at the scene. And it is not limited to cases involving a sexual assault. Thus, the prosecution can effectively circumvent the statute of limitations in any case in which the police happen to find DNA evidence linking a suspect to the crime. In those cases, an arrest warrant identifying the suspect only by his or her DNA profile can be filed and the statute of limitations will not bar the case from being prosecuted whenever a match is made—whether that be a matter of months, years, or decades.

The majority opinion will have the unfortunate effect of usurping the Legislature's reasoned and measured treatment of the statute of limitations in cases involving DNA evidence. After the statute of limitations had expired in this case, the Legislature enacted subdivision (g)(1) of section 803, which establishes a special one-year statute of limitations for certain sexual offenses, including rape, that runs from "the date on which the identity of the suspect

is conclusively established by DNA testing."[3] The Legislature carefully limited the scope of section 803, subdivision (g)(1). It is limited to those sexual offenses for which a conviction would result in lifetime sexual offender registration under section 290. The DNA evidence must be analyzed "no later than two years from the date of the offense." (§ 803, subd. (g)(1)(B).) And the criminal complaint must be filed within one year from when the identity of the suspect is established. None of these limitations apply to the majority's holding. A DNA arrest warrant may be filed for any criminal offense. The DNA evidence may be analyzed at any time before the ordinary statute of limitations for the offense has run. And because the filing of the DNA arrest warrant satisfies the statute of limitations, if the DNA profile later is matched to a suspect's DNA, there is no further statute of limitations governing when the prosecution must amend the arrest warrant and arrest the suspect and file a criminal complaint.

The majority's holding will thus abrogate the careful limitations crafted by the Legislature. The prosecution can use DNA arrest warrants to satisfy the statute of limitations for crimes expressly excluded from the scope of section 803, subdivision (g)(1). For sexual crimes covered by section 803, subdivision (g)(1), if the prosecution fails to analyze the DNA evidence within two years from the date of the offense, the majority's holding would still permit the prosecution to analyze the evidence and file a DNA arrest warrant at any time before the ordinary statute of limitations for the offense expires. And if the prosecution has satisfied the statute of limitations by filing a DNA arrest warrant, the limitation imposed by section 803, subdivision (g)(1) that a criminal complaint must be "filed within one year of the date on which the identity of the suspect is conclusively established by DNA testing" does not apply.

Our resolve as a court is tested when we are called upon to release a guilty person in order to defend a principle. This defendant certainly committed heinous crimes against an innocent victim, but it is our duty to apply the laws enacted by the Legislature evenly and rationally, even if that means letting a guilty person go free. "[T]he potential that a guilty person will avoid just punishment is inherent in all statutes of limitations. Society has assumed this loss in exchange for other considerations." (*People v. Frazer, supra*, 21 Cal.4th at p. 784 (dis. opn. of Brown, J.).)

---

[3] It is interesting to note that the Legislature used the phrase "the date on which the identity of the suspect is conclusively established by DNA testing" to mean when a DNA profile obtained from evidence collected from the crime scene is matched to a particular suspect. This is at odds with the majority's holding that obtaining a DNA profile from evidence collected from a crime scene identifies the suspect.

The DNA arrest warrant in this case was not a true warrant, because it did not authorize the arrest of anyone. It was a shell, a clever artifice designed to satisfy the statute of limitations so the criminal investigation could continue indefinitely until the perpetrator was identified. The filing of the DNA arrest warrant in this case did not commence a criminal prosecution against defendant and, thus, did not satisfy the statute of limitations.

Werdegar, J., concurred.