Filed 3/17/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G049090 |
|      v. | (Super. Ct. Nos. SWF028834, SWF10001439, SWF1100223) |
| NICHOLAS JOHN SMIT, | |
|    Defendant and Appellant. | O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Mark Mandio, Judge.  Affirmed.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Nicholas John Smit was charged with a number of drug offenses that exposed him to a maximum of 11 years in state prison. How did defendant attempt to avoid those 11 years? By trying to kill the detective whose testimony was required to convict him, of course. None of the usual suspects such as Wile E. Coyote, Elmer Fudd or Yosemite Sam, not even Boris or Natasha, ever eclipsed what defendant did here.

A jury convicted defendant of several drug offenses and four counts of attempted murder on Detective Charles Johnson. Defendant's efforts to kill the detective included attempting to fire a military rocket at the building where the detective worked, setting three boobytraps using panji boards and three more using zip guns. One of the zip gun boobytraps was attached to a fence gate and designed to shoot when the gate was opened. The other zip gun boobytraps were rigged underneath vehicles known to be driven by the detective. We publish this case because defendant's use of zip gun boobytraps requires us to decide whether his conduct qualifies as personal use of a firearm under Penal Code section 12022.53.[1] We decide that setting a zip gun boobytrap so qualifies.

In a way, defendant's attempts to kill the detective were successful. He no longer faced that 11 years. Instead, the court sentenced him to four consecutive life terms, plus an additional term of more than 40 years.

I

FACTS[2]

*The Drug Charges*

Johnson of the Hemet Police Department obtained a search warrant for defendant's residence and executed it when defendant arrived home on June 25, 2009.

---

[1] Undesignated statutory references are to the Penal Code.

[2] A full recitation of the facts is not necessary to resolve the issues raised by defendant.

Inside a safe in defendant's bedroom, the police found: $580 in U.S. currency, a MoneyGram receipt bearing defendant's name, a checkbook with checks bearing defendant's name and address, an Ohaus digital scale, 60 one-inch-by-one-inch Ziploc baggies, two tubes used for snorting cocaine, approximately 11.6 grams of cocaine, a plastic bag containing 254 grams (over one-half pound) of suspected marijuana, a jar containing two "chunks" of suspected methamphetamine, five Vicodin tablets, a pay/owe sheet, a jar containing 14 or 15 grams of marijuana, a loaded .22-caliber Browning pistol, a box of .22 ammunition, defendant's income tax returns for 2007, 2008, and 2009, and a blue bank bag containing more .22-caliber ammunition.

In the backyard, police found six marijuana plants. Additional small marijuana plants were found in a closet. Johnson opined the marijuana and cocaine were possessed for sale.

Defendant was booked into the Riverside County jail. The district attorney filed the drug charges against defendant on July 17, 2009. Defendant was released from custody pending trial on the drug charges.

*Count Six:  Boobytrap Devices (Panji Boards)*

Johnson, a member of the police department's gang task force, was assigned an unmarked 2007 Ford Crown Victoria, which he drove home at night. He typically worked Tuesday through Friday. Less than a week after being assigned to the gang task force, Johnson was to testify in defendant's preliminary examination on the drug charges scheduled for December 7, 2009.

Prior to December 7, Johnson was informed the preliminary examination would not go forward on that date. About 10:00 p.m. on Sunday, December 6, the day before the scheduled preliminary examination, it was raining when Johnson went to bed. Johnson heard nothing unusual that night. At 6:00 a.m., he went out to the Crown Victoria to head to the gym. He saw a panji board outside his vehicle. The board

3

contained six-inch barbed nails or spikes sharpened at one end. There was a substance embedded into the barbed areas. The substance appeared similar to fecal matter mixed with ground glass. Johnson found like devices outside his wife's and his son's vehicles. Johnson said the boards were similar to those used by the Vietcong during the Vietnam War, when sharpened bamboo sticks were used instead of nails.

He also found several chrome "ball bearings" of the type used with "wrist rockets," a type of slingshot, in his driveway. The ball bearings had knocked paint off his garage and left indentations in the garage door. Additionally, a kitchen window had been broken by a "much larger chrome ball bearing."

*Counts Seven and Eight: Attempted Murder of Johnson and Hess with a Zip Gun[3]*

Matthew Hess, a sergeant with the Hemet Police Department, supervised the gang task force. He said Johnson was consistently early to work, sometimes starting an hour before anybody else in the unit.

The gate outside the gang task force's parking lot was closed at the end of every shift. The first officer to arrive in the morning would open the gate and it remained open until the end of the shift. On February 23, 2010, Hess was the first to arrive at the task force building. Johnson had called stating he had to go to court to testify and requested permission to go straight to court instead of reporting to the task force first.[4]

Hess drove up to the closed gate that morning. He got out of his vehicle and started to open the gate. When it was open about three or four feet, Hess heard "a loud bang." He thought it was a gunshot, but did not see anyone with a gun. Another

---

[3] Count eight of the information charged defendant with attempting to murder Hess. The jury was unable to reach a verdict on that count and the charge was eventually dismissed.

[4] Johnson had been subpoenaed on January 5, 2010, to appear at defendant's preliminary examination on the drug charges on February 24. Johnson is certain, however, he was "called off" prior to the scheduled hearing date.

4

member of the team parked behind Hess said he did not see anything. Hess went back to the gate and saw it had a device attached to it. The device was a black metal tube—a zip gun—that blended in with the black fence. The zip gun was attached by black electrical-type tape and had a lanyard. The tube of the zip gun was about the same size as the horizontal metal bar at the top of the gate. Hess said he would have been shot in the left side of his head had he been facing the gate as he opened it.

Hess found a black belt he likened to a vacuum cleaner belt on the ground next to the gate. An officer recovered a spent .38-caliber hollow point bullet a short distance away.

An investigator conducted research on the Internet to determine whether plans for making a zip gun like the one found on the gang task force's gate are online. He found a Web page with images and a link to a manual that provided plans for zip guns and panji boards. The zip gun plans "appeared almost identical" to the zip gun found on the gate. The manual also contained an image of a panji board and suggested creating barbs on the spikes and dipping them in an infectious substance, such as feces, to aid in causing infection. The manual contained references to slingshots and discussed how to avoid leaving fingerprints and DNA on items. The dents to Johnson's garage door appeared to have been caused by ball bearings shot from a slingshot or wrist rocket.

After the February 23 incident, the task force moved to a different location inside the Hemet Police Department for a period of time and then to another building with a parking lot, wrought iron fence, security cameras, and a remote control electronic gate. Johnson continued to work on the task force.

*Count Nine:  Attempted Murder of Johnson with a Zip Gun*

Johnson was again subpoenaed for defendant's preliminary examination on the drug charges, then set for March 5, 2010. That morning, Johnson drove his assigned Crown Victoria from his home and headed to the courthouse. He stopped on the way at a

nearby Arco AM/PM to get a cup of coffee. He made a hard turn as he backed out of the parking stall and heard a "ka chunk." Thinking he ran over a piece of metal, Johnson put the Crown Victoria in park and got out of the vehicle to see what he ran over. He saw a device similar to the zip gun that had been on the gang task force's gate a few weeks earlier. The zip gun had fallen from beneath the Crown Victoria.

Johnson thought the implement might be an explosive device and radioed the police station. The bomb squad was called in. Officers responded and cleared the area of civilians. X-rays showed the device was a zip gun, not a bomb. The zip gun was loaded and had a metal pipe with an inner barrel. The triggering mechanism involved the use of a weight. Attached to the metal pipe was a magnet. The zip gun was nearly identical to the one that had been attached to the gate.

An investigator examined the underside of the Crown Victoria. He found fresh markings which gave the appearance that a large object had been in the area of the markings, creating a number of scratches. It appeared the zip gun had been attached to the underside of the Crown Victoria with the magnet and at a 45-degree angle. A rivet was missing from the cowling in the same area. A rivet was subsequently found where Johnson had parked the Crown Victoria at his residence the night before.

*Count 11: Attempted Murder of Johnson with a Rocket*

After the second zip gun incident, the chief of police told Johnson to take his family out of town for the weekend. He was placed on leave through the remainder of March 2010 and into April. Johnson's residence was put under 24-hour surveillance. In May 2010, Johnson moved out of town. The department assigned him a commuter vehicle, a Ford Taurus to drive to and from work. While at work, he drove the same Crown Victoria as before.

On June 3, 2010, defendant's drug charges were set for trial. The matter was continued to the next day. On June 3, Johnson left the Crown Victoria parked at the

6

gang task force's headquarters. At approximately 10:00 p.m. that night, fire personnel answered a call about a fire and a large plume of smoke near the gang task force's headquarters. A bomb technician with the Riverside County Sheriff's Department responded to the scene about 11:00 p.m. He had been called because an M29[5] rocket and a MAPP gas cylinder (propane or butane) had been found on the roof of the Los Altos market where the fire had just been extinguished. Los Altos market is approximately 100 yards from the gang task force's headquarters. There were scorch marks on the roof and heavy smoke damage on the walls. The gang task force's headquarters and Johnson's Crown Victoria were visible from the roof of the market. It appeared as if someone had attempted to launch the rocket, causing the fire.

Prior to June 3, 2010, defendant had a rocket at his residence. Codefendant Steven Hansen[6] had purchased it for $1,000 and sold it to defendant for $3,000. Defendant's bank records show he withdrew $3,000 from his account on May 20, 2010.

A roommate heard defendant say he was after a particular police officer and knew when the officer was supposed to be at headquarters, but he did not care if he got all "those f . . . ers." Defendant said he wanted to prevent a police officer from testifying on a drug case. Hansen told one of defendant's roommates he was building a rocket launching tube with defendant on a roof in downtown Hemet to shoot at the police station.

After the failed attempt with the rocket, defendant sought to purchase another military rocket. He said he needed a replacement because the rocket he used had failed. He added that he had rigged two car bombs and because the police had "egg on

---

[5] An M28 is a high explosive anti-tank round. An M29 rocket is the same design, but is a practice round. The outward difference in appearance of the two is the existence of a small number of crimps on the live round, a fact defendant apparently did not know.

[6] Hansen was the codefendant in two counts and is not a party to this appeal.

7

their face" after the first one, they had not made the second one known. Defendant said the attacks were aimed at "that cop" on the gang task force who arrested him for having marijuana plants.

*Count 12: Another Attempted Murder of Johnson with a Zip Gun*

On July 6, 2010, Johnson took his commuter car, the Taurus, in for service at the city yard. When it was put on the rack and elevated, the mechanic found a zip gun by the left front tire, on top of the control arm. The zip gun was wrapped in black Polyken 236 duct tape. The zip gun's design was consistent with the zip gun used in count nine and had a black rubber band around it. The barrels of the zip gun were facing the left front tire. A member of the bomb squad disassembled the zip gun and removed the bullets. One had been struck by a firing pin, but had not fired.

Although this zip gun was different from the others in that it had two inner barrels, like the others, it used a screw as a firing pin, and all three zip guns were similarly made and used similar materials. The cartridges in the zip gun were the same (.30-06 Twin Cities Arsenal ammunition made in 1954) as the cartridge used in the zip gun attached to Johnson's Crown Victoria (count nine).

*Evidence Found at Defendant's Residence*

On July 2, 2010, police arrested defendant and executed a search warrant on his residence. Inside a bedroom containing documentation in defendant's name, police found a computer and a slingshot. Police also found newspaper articles, a bucket containing slingshots and pellets, a black rubber band, and four bolts.

In a car parked on the property, police found defendant's driver's license, a pair of blue latex gloves, and black tape.[7] A fence finial, similar to the one used in the

---

[7] Black tape was found in several other locations at the residence as well.

8

zip gun involved in count nine was located outside the residence. A gas cylinder found at defendant's residence was similar to the one found on the roof with the rocket back in June. Rubber bands found in defendant's residence had the same color, length, width, thickness, outer texture, and inner texture as the rubber bands used on all three zip guns, and commercially available only on "Moon Shoes." Poyken duct tape located at defendant's residence was the same type used to wrap the zip gun attached to the Taurus.

*DNA Evidence*

A crime scene technician was unable to lift any fingerprints from the panji boards. No useable DNA was found on two of the boards and defendant was excluded as the donor of DNA found on the nails on the remaining panji board.

The components of the zip gun and the black tape wrapped around the zip gun that had been attached to the gate at the gang task force's headquarters were checked for DNA. A single source DNA profile was found. The DNA profile was subsequently submitted to CODIS.[8] CODIS showed the DNA matched one individual, defendant.

DNA was also found on parts of the zip gun that had been attached to the Crown Victoria. There were at least two contributors of the DNA. The DNA on the zip gun was consistent with the DNA of both defendant and his girlfriend.

II

DISCUSSION

Defendant contends the evidence does not support his conviction on count six for building and maintaining a boobytrap (§ 12355, subd. (a)). He also argues the evidence does not support the enhancement for personal use of a firearm (§ 12022.53, subd. (b)) found in connection with the attempted murders in counts seven, nine, and twelve.

---

[8] Combined DNA Index System. (See *People v. Robinson* (2010) 47 Cal.4th 1104, 1127.)

As we have stated before, "'"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] We must accept all assessments of credibility made by the trier of fact and determine if substantial evidence exists to support each element of the offense. [Citation.] We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. [Citation.] We may reverse for lack of substantial evidence only if '"upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.]' [Citation.] In making this inquiry, it is important to note we do not ask ourselves whether *we* believe the evidence established guilt beyond a reasonable doubt. [Citation.] 'Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]' [Citation.] 'The standard of review is the same when the prosecution relies mainly on circumstantial evidence. [Citation.]' [Citation.]" (*People v. Sanchez* (2014) 223 Cal.App.4th 1, 8-9.)

A. *The Evidence Supports Defendant's Conviction on Count Six.*

Defendant was convicted of violating former section 12355, subd. (a). (Stats. 1984, ch. 1430, § 1.5.) Subdivision (c) of that section defines a "boobytrap" as "any concealed or camouflaged device designed to cause great bodily injury when triggered by an action of any unsuspecting person coming across the device. Booby traps may include, but are not limited to, guns, ammunition, or explosive devices attached to trip wires or other triggering mechanisms, sharpened stakes, and lines or wires with hooks attached." (Former § 12355, subd. (c).) Subdivision (a) of former section 12355 made it a felony to "assemble[], maintain[], place[], or cause[] to be placed a

10

boobytrapped device." The subjects of count six were the panji boards placed outside of Johnson's vehicle, his wife's vehicle, and his son's vehicle. Defendant does not argue the panji boards do not qualify as boobytraps. Rather, he argues the evidence did not connect him to the panji boards. He is wrong.

Defendant does not contest the sufficiency of the evidence supporting his conviction on the counts involving the zip guns. However, unlike the evidence in connection with those offenses, there was no DNA or fingerprint evidence tying defendant to the panji boards. There was, however, other evidence from which a reasonable jury could have found defendant guilty.

Attacks on Johnson began after the initial search of defendant's residence. Defendant made a number of attempts to kill Johnson. Johnson's testimony was required in the drug prosecution against defendant. Three attempts were made on the day before or the day Johnson was scheduled to testify in connection with the drug counts. The panji boards were utilized on a day when Johnson was to appear in court on defendant's case. There was evidence from which the jury could reasonably conclude defendant learned to construct the zip guns, panji boards, and wrist rockets on a site on the Internet.

The night the panji boards were put in place, a slingshot or wrist rocket was apparently used to shoot ball bearing-like objects at Johnson's house. When the police searched defendant's residence, they not only found materials apparently used to create the zip guns and a can of butane like the one used in the failed attempt to launch a rocket at the building where Johnson worked, they also found slingshots and pellets. The jury was entitled to conclude the existence of the slingshots and pellets at defendant's residence, along with materials used to construct the zip guns (including the same ammunition used) and a gas propellant like the one used in the failed attempt to fire a rocket at the building where Johnson worked, was not mere coincidence.

"This was one of those cases which might be likened to a rope. Single strands, considered apart, might not be convincing; but, when these strands are knit

11

together, there is indeed a formidable rope, quite strong enough to form a substantial support to the jury's verdict." (*Fields v. United States* (4th Cir. 1955) 228 F.2d 544, 549.) In addition to the evidence tying defendant to the attempts on Johnson's life with the zip guns and the rocket used in those attempts, the circumstantial evidence pointing to defendant as the source of the panji boards and ball bearings found in Johnson's driveway was substantial and supports the jury's determination of guilt on count six.

B. *The Evidence Supports the Firearm Use Enhancements*

The jury found the personal firearm use enhancements (§ 12022.53, subd. (b)) true in connection with counts seven, nine, and twelve, the counts in which defendant was convicted of attempting to murder Johnson with a zip gun. The enhancement applies when a defendant "personally uses a firearm" (§ 12022.53, subd. (b)) in the commission of an attempted murder (§ 12022.53, subds. (a)(1), (18)). The issue presented is one of first impression: If a defendant sets a trap using a rigged firearm—i.e., the defendant need not be present for the firearm to discharge—has the defendant personally *used* a firearm within the meaning of section 12022.53? For the reasons stated below, we answer this question in the affirmative.

The Legislature created enhancements for defendants who are armed with a firearm in the commission of a felony (see §12022, subd. (a)(1)) and those who personally use a firearm in the commission of a felony (see e.g., §§ 12022.5, 12022.53). The penalties for the use of a firearm are greater than that those provided for merely being armed at the time a felony is committed. (Compare § 12022, subds. (a)(1) [one-year enhancement for being armed], (c) [three, four, or five-year term for being "personally" armed in commission of certain drug offenses], with §§ 12022.5, subd. (a) [three, four, or 10-year term for personally using a firearm], 12022.53, subd. (b) [10-year enhancement for personally using firearm in commission of listed offense]).

The difference in penalties correspond to the difference between the danger presented by one's merely being armed, in which case there is the *potential* that the firearm will be employed in the commission of a felony, and the "use" of the weapon, in which case the firearm was employed in the commission of the felony. (See *People v. Chambers* (1972) 7 Cal.3d 666, 672.)

In *Chambers*, our Supreme Court defined "use" for purposes of a firearm enhancement. "'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People v. Chambers*, *supra*, 7 Cal.3d at p. 672.)

Undeniably, one who fires a gun at another has used the firearm for purposes of the firearm use enhancements. However, "use" is not limited to the actual firing of a gun. Cases considering firearm use enhancements have customarily fallen into two categories: "those in which the gun was aimed at the victim, intentionally fired or used to strike the victim; and those in which the gun was held or exposed in a menacing fashion accompanied by words threatening a more violent use. [Citation.]" (*People v. Jacobs* (1987) 193 Cal.App.3d 375, 381.) Defendant does not contend a zip gun does not qualify as a firearm. Nor could he. At the time of defendant's offenses, section 12001 defined "firearm" as "any device, designed to be used as a weapon, from which is expelled through the barrel, a projectile by the force of any explosion or other form of combustion." (Former § 12001, subd. (b); Stats. 2007, ch. 163, § 1.) Rather, he asserts rigging a firearm with the potential to fire when he is not present should not be considered a personal *use* of the firearm. He does not say why this is so, other than citing a number of cases in which a defendant found to have personally used a firearm in the commission of a felony was actually present at the time of its use against the victim.

13

As pointed out above, "'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' [Citation.]" (*People v. Chambers*, *supra*, 7 Cal.3d at p. 672.) Defendant clearly *used* the zip gun to carry out his purpose of attempting to kill Johnson. Knowing Johnson was usually the first one to work and being the first one he would have to open a gate to park his patrol car at work, defendant rigged a zip gun to the gate at head height. The zip gun was rigged to discharge when the gate opened. Fortunately for all concerned, including defendant, the weapon missed its target. Additionally defendant rigged zip guns to the two vehicles Johnson was known to drive. He sought to kill Johnson by using the zip guns. "[T]here is no one particular type of firearm use proscribed" by the firearm use enhancement statutes. (*People v. Smith* (1980) 101 Cal.App.3d 964, 967 [§ 12022.5].) "Whether a gun is 'used' in the commission of an offense—'at least as an aid'—is broadly construed within the factual context of each case." (*Alvarado v. Superior Court* (2007) 146 Cal.App.4th 993, 1002, fn. omitted.) Under any definition of the term "use," defendant used firearms in the commission of the attempted murders.

Moreover, finding defendant's action qualified as use of a firearm under section 12022.53, subdivision (b) fulfills the Legislature's intended purpose. One who shoots another has *used* a firearm. (See *People v. Johnson* (1974) 38 Cal.App.3d 1, 12.) The culpability of a defendant who stands in front of his victim and shoots is no greater than defendant's. Whether shooting an individual face-to-face, from a place of concealment, by remote control, or by means of a boobytrap, a defendant has *used* a firearm to carry out his purpose. Defendant has cited no reason why the plain language of section 12022.53 should not apply in this matter. Accordingly, we conclude the evidence supports the personal use enhancements.

14

### III

### DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

15